AO 106 (REV 4/10) Affidavit for Search Warrant                    AUSA Barry Jonas, (312) 886-8027

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### <u>UNDER SEAL</u>

In the Matter of the Search of:                    Case Number:  17 CR 236

The Google account abdwali.es@gmail.com, further
described in Attachment A

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Phillip Viggiani, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

**See Attachment A**

located in the Northern District of California, there is now concealed:

**See Attachment A**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence.

The search is related to a violation of:

**FILED**

**JUN 22 2017**

M. DAVID WEISMAN
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 2339B | conspiring to knowingly provide and attempt to provide material support and resources, namely, personnel and equipment to a foreign terrorist organization |

The application is based on these facts:

**See Attached Affidavit,**

Continued on the attached sheet.

_____
*Applicant's Signature*

<u>PHILLIP VIGGIANI, Special Agent, Federal Bureau of Investigation</u>
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 22, 2017

_____
*Judge's signature*

City and State: <u>Chicago, Illinois</u>

<u>M. David Weisman, U.S. Magistrate Judge</u>
*Printed name and title*

UNITED STATES DISTRICT COURT )

)

NORTHERN DISTRICT OF ILLINOIS )

**AFFIDAVIT**

I, Phillip Viggiani, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately January 2016.

2.     As part of my duties as an FBI Special Agent, I investigate criminal violations relating to international terrorism, including providing and conspiring, and attempting to provide, material support or resources to foreign terrorist organizations, in violation of Title 18, United States Code, Section 2339B(a)(1). As a result of my training and experience, to include information provided by other federal agents with applicable knowledge, I am familiar with the tactics, methods, and techniques used by terrorist networks and their members. In addition, I have participated in the execution of multiple federal search warrants.

3.     This affidavit is made in support of an application for a warrant to search, pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), for information associated with certain account(s) that are stored at the premises owned, maintained, controlled, or operated by Google, a free web-based electronic mail service provider located at 1600 Amphitheatre Parkway, Mountain View, California, 94043. The account to be searched is abdwali.es@gmail.com (hereinafter, **"Subject Account 5"**), which is further described in the following

paragraphs and in Part II of Attachment A. As set forth below, there is probable cause to believe that in the accounts, described in Part II of Attachment A, in the possession of Google, there exists evidence of violations of Title 18, United States Code, Section 2339B(a)(1).

4. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence of violations of Title 18, United States Code, Section 2339B, are located in the Subject Account.

## I. BACKGROUND INFORMATION

5. On April 11, 2017, Joseph Jones and Edward Schimenti were charged by complaint with one count of knowingly conspiring with each other to provide and attempt to provide material support and resources, namely, personnel and equipment, to a foreign terrorist organization, namely, the Islamic State of Iraq and al Sham, knowing that the organization was a designated foreign terrorist organization, and that the organization had engaged in and was engaging in terrorist activity and terrorism, in violation of Title 18, United States Code, Section 2339B. 17 CR 236. Both defendants have been detained since their arrest on April 12, 2017.

6.     On April 14, 2017, Magistrate Judge Weisman authorized the execution of search warrants for accounts Only1Not3@gmail.com, bearing Google account identifier 885728284521, Google+ account Yusuf Abdulhaqq, bearing Google account identifier 101048394589572746819 and Google+ account Ed Schmenti, bearing Google account identifier 100783711383486348671; and Facebook account Ed Schimenti bearing identifier 100005050058372.

7.     On April 27, 2017, Joseph Jones and Edward Schimenti were charged by indictment with one count of conspiring to provide material support to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.

8.     This affidavit incorporates the attached affidavit (Ex. A) for the previously authorized Google and Facebook search warrants and sets forth the below additional facts supporting probable cause to search **Subject Account 5**.

## II.    FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT ACCOUNTS

9.     On or about May 7, 2017, Google provided the results for the search warrant of Google+ account Ed Schmenti, bearing Google account identifier 100783711383486348671.

10.    According to the records provided by Google in response to the search warrant, the email address associated to Schimenti's Google+ account 100783711383486348671 was **Subject Account 5**. The IP login information for this email account indicated **Subject Account 5** was last accessed on or about April 12,

2017 at 03:53:35 UTC. When this UTC time was converted to U.S. Central Time, the approximate date and time **Subject Account 5** was last accessed was on or about April 11, 2017 at approximately 10:53 PM. Schimenti was taken into federal custody on April 12, 2017 at approximately 5:00 AM.

11.     The search warrant results from Schimenti's Google+ account also provided the content of the direct messages sent and received from **Subject Account 5** to other online users. For example, from approximately September 2015 through May 2016, Schimenti sent and received communications from Undercover Employee 4 (UC4) using **Subject Account 5**. On or about September 18, 2015, UC4 inquired Schimenti, "Al salamu alaykum wa rahmatu allahi wa barakatuhu. Are you on facebook by the same name? Jazaka Allahu khayran." On or about September 23, 2015, Schimenti responded, "Wa alaikum assalam w a rahmatullah, yes, but its Eddie Schimenti, how bou yerself?"

12.     On or about April 12, 2017, FBI Chicago interviewed Individual A, who was an associate of Schimenti. During the interview, Individual A stated s/he had knowledge of Schimenti discussing ISIS, and that Schimenti had previously sent him/her social media links to ISIS videos.

13.     On or about April 29, 2017 through May 1, 2017, Individual A voluntarily provided FBI Chicago with 33 emails sent to him/her from Schimenti through **Subject Account 5**, which were dated between May 17, 2016, and July 8, 2016.

14.     FBI Chicago reviewed the emails provided by Individual A. The subject of the emails appear to be regarding ISIS. The subject lines state "Jihad," "Jihad 2," and "Shariah." The emails contain links to articles and videos which appear to be violent ISIS propaganda videos.

15.     On June 30, 2016, Individual A received an email from **Subject Account 5** with the subject line of "Hearts minds," and the link embedded in the email referenced "Battle of the hearts and minds Alwaki PDF." This appears to be a lecture by Anwar Alwaki, who, in 2010, had been designated by the Department of Treasury as a Specially Designated Global Terrorist.

16.     On or about June 5, 2017, FBI Chicago reviewed "Battle of the hearts and minds Alwaki." It is an approximately hour-long lecture of a male individual who appears to be Alwaki, discussing the struggle of ideas in the Muslim world and how the United States has attempted to persuade the hearts and minds of Muslims. Alwaki stated this battle of ideas is an internal problem for the Muslim world, and should not be interfered with by the United States Government. Alwaki continued by stating this battle of ideas is between Muslims, specifically those who choose to follow Islam in its entirety versus those who selectively follow Islam and not the whole true path of Islam.

17.     On or about May 18, 2017, FBI Chicago interviewed Joseph Jones, who is cooperating and is expected to plead guilty pursuant to a cooperation plea agreement. During this interview, Jones stated Schimenti was the user of Google

5

email address **Subject Account 5**. Furthermore, Jones stated Schimenti used **Subject Account 5** to email books, information contained in portable document format (PDF) files, and videos supporting ISIS.

18. On or about March 21, 2017, a 90-day preservation letter was served on Google for **Subject Account 5**.

19. Based on my training and experience in other investigations, I believe that a search of email provider account contents of individuals engaged in criminal conduct yields investigative leads relating to:

a. the identities of co-conspirators and other individuals engaged in conspiring and attempting to provide material support to a foreign terrorist organization;

b. the contact information of co-conspirators, customers, and other individuals engaged in conspiring and attempting to provide material support to a foreign terrorist organization; and

c. the timing of communications among co-conspirators, customers, and other individuals involved in conspiring and attempting to provide material support to a foreign terrorist organization.

## III. SEARCH PROCEDURE

20. In order to facilitate seizure by law enforcement of the records and information described in Attachment A, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

6

2703(c)(1)(A), to permit employees of Google to assist agents in the execution of this warrant. In executing this warrant, the following procedures will be implemented:

a.    The search warrant will be presented to Google personnel who will be directed to the information described in Section II of Attachment A; and

b.    In order to minimize any disruption of computer service to innocent third parties, Google employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II of Attachment A, including an exact duplicate of all information stored in the computer accounts and files described therein.

21.    Google employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A and all information stored in those accounts and files to the agent who serves this search warrant; and

22.    Following the protocol set out in the Addendum to Attachment A, law enforcement personnel will thereafter review all information and records received from Google employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A.

## IV.    CONCLUSION

23.    Based on the above information, I respectfully submit that there is probable cause to believe that evidence of violations of Title 18, United States Code, Section 2339B(a)(1) are located within one or more computers and/or servers found at Google, headquartered at 1600 Amphitheatre Parkway, Mountain View,

California, 94043. By this affidavit and application, I request that the Court issue a search warrant directed to Google allowing agents to seize the electronic evidence and other information stored on the Google servers following the search procedure described in Attachment A and the Addendum to Attachment A.

FURTHER AFFIANT SAYETH NOT.

Phillip Viggiani
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
before me this 22nd day of June, 2017

Honorable M. David Weisman
United States Magistrate Judge

8

## ATTACHMENT A

### I.  SEARCH PROCEDURE

1.  The search warrant will be presented to Google personnel, who will be directed to isolate those accounts and files described in Section II below.

2.  In order to minimize any disruption of computer service to innocent third parties, company employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein.

3.  Google employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant.

4.  Following the protocol set out in the Addendum to this Attachment, law enforcement personnel will thereafter review information and records received from company employees to locate the information to be seized by law enforcement personnel specified in Section III below.

### II.  FILES AND ACCOUNTS TO BE COPIED BY EMPLOYEES OF GOOGLE

To the extent that the information described below in Section III is within the possession, custody, or control of Google, which are stored at premises owned, maintained, controlled, or operated by Google, headquartered at 1600 Amphitheatre

Parkway, Mountain View, California, 94043, Google is required to disclose the following information to the government for the following account:

**Abdwali.ES@gmail.com**

a.    All available account contents from inception of account to present, including e-mails, attachments thereto, drafts, contact lists, address books, and search history, stored and presently contained in, or maintained pursuant to law enforcement request to preserve.

b.    All electronic files stored online via Google Drive, stored and presently contained in, or on behalf of the accounts described above.

c.    All search history records stored and presently contained in, or on behalf of the accounts described above including, if applicable, web and application activity history (including search terms), device information history, and location history.

d.    All existing printouts from original storage of all the electronic mail described above.

e.    All transactional information of all activity of the electronic mail addresses and/or individual accounts described above, including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations.

f.    All business records and subscriber information, in any form kept, pertaining to the electronic mail addresses and/or individual accounts described above, including applications, subscribers' full names, all screen names associated

2

with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing and payment records.

g. All records indicating the services available to subscribers of the electronic mail addresses and/or individual accounts described above.

h. All account contents previously preserved by Google, in electronic or printed form, including all e-mail, including attachments thereto, and Google Drive stored electronic files for the accounts described above).

i. All subscriber records for any Google account associated by cookies, recovery email address, or telephone number to the accounts described above.

## III.    Information to be Seized by Law Enforcement Personnel

All information described above in Section II that constitutes evidence concerning violations of Title 18, United States Code, Section 2339B(a)(1), as follows:

1. Items related to the Islamic State of Iraq and the Levant ("ISIL"), the Islamic State of Iraq and Syria ("ISIS"), Abu Bakr al-Baghdadi, jihad, terrorism, martyrdom, bayah, weapons or physical training, and any individuals or organizations associated with the above.

2. Items related to the commission of acts of violence in the United States or overseas, including justifications for such conduct, the selection of a target or targets, the logistics of such conduct, and any tools or weapons to be used in such conduct.

3.   Items related to the purchase of cellular phones.

4.   Communications with UC1, UC2, UC3, UC4, CHS, EDWARD SCHIMENTI, and JOSEPH JONES, or any other individual who appears to be associated with ISIS.

5.   Items concerning the ownership, use or control of the **Subject Account.**

6.   All of the records and information described in Section II (e), (f), (g), and (i).

## ADDENDUM TO ATTACHMENT A

With respect to the search of any information and records received from the free web-based electronic mail service provider, law enforcement personnel will locate the information to be seized pursuant to Section III of Attachment A according to the following protocol.

The search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

    a.    searching for and attempting to recover any hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

    b.    surveying various file directories and the electronic mail, including attachments thereto to determine whether they include data falling within the list of items to be seized as set forth herein;

    c.    opening or reading portions of electronic mail, and attachments thereto, in order to determine whether their contents fall within the items to be seized as set forth herein; and/or

    d.    performing key word searches through all electronic mail and attachments thereto, to determine whether occurrences of language contained in such

electronic mail, and attachments thereto, exist that are likely to appear in the information to be seized described in Section III of Attachment A.

Law enforcement personnel are not authorized to conduct additional searches on any information beyond the scope of the items to be seized by this warrant.

A

# EXHIBIT A

AO 106 (REV 4/10) Affidavit for Search Warrant                    AUSA Rajnath Laud, (312) 469-6306

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### UNDER SEAL

In the Matter of the Search of:                    Case Number:   17 CR 236

The Facebook account 100005050058372, further
described in Attachment A-2

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Cassandra B. Carnright, a Special Agent of the Federal Bureau of Investigation, request a search warrant
and state under penalty of perjury that I have reason to believe that on the following property or premises:

**See Attachment A-2**                    **RECEIVED**

located in the Northern District of California, there is now concealed:

**APR 14 2017**

**See Attachment A-2, Part III**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence.         M  DAVID WEISMAN
                                                                            MAGISTRATE JUDGE
The search is related to a violation of:                                    UNITED STATES DISTRICT COURT

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 2339B(a)(1) | conspiring and attempting to provide material support to a foreign terrorist organization |

The application is based on these facts:

**See Attached Affidavit,**

Continued on the attached sheet.

_____
*Applicant's Signature*

CASSANDRA B. CARNRIGHT, Special Agent, Federal Bureau
of Investigation
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 14, 2017                     *M. David Weisman* [signature]
_____     _____
                                         *Judge's signature*

City and State: Chicago, Illinois        M. DAVID WEISMAN, U.S. Magistrate Judge
_____     _____
                                         *Printed name and title*

UNITED STATES DISTRICT COURT    )

                                  )

NORTHERN DISTRICT OF ILLINOIS    )

### AFFIDAVIT

I, Cassandra B. Carnright, being duly sworn, state as follows:

1.    I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately March 2016.

2.    As part of my duties as an FBI Special Agent, I investigate criminal violations relating to international terrorism, including providing and conspiring, and attempting to provide, material support or resources to foreign terrorist organizations, in violation of Title 18, United States Code, Section 2339B(a)(1). As a result of my training and experience, to include information provided by other federal agents with applicable knowledge, I am familiar with the tactics, methods, and techniques used by terrorist networks and their members. In addition, I have participated in the execution of multiple federal search warrants.

3.    This affidavit is made in support of an application for a warrant to search, pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), for information associated with certain account(s) that are stored at the premises owned, maintained, controlled, or operated by Google, a free web-based electronic mail service provider located at 1600 Amphitheatre Parkway, Mountain View, California, 94043 and Facebook, 300 Constitution Drive, Menlo Park, California, 94025. The accounts to be searched are Only1Not3@gmail.com, bearing Google account identifier 885728284521 (hereinafter, "**Subject Account 1**"),

Google+ account Yusuf Abdulhaqq, bearing Google account identifier 101048394589572746819 (hereinafter, "**Subject Account 2**") and Google+ account Ed Schmenti, bearing Google account identifier 100783711383486348671 (hereinafter, "**Subject Account 3**"); and Facebook account Ed Schimenti bearing identifier 100005050058372 (hereinafter, "**Subject Account 4**") (collectively, "the **Subject Accounts**"), which are further described in the following paragraphs and in Part II of Attachments A-1 and A-2. As set forth below, there is probable cause to believe that in the accounts, described in Part II of Attachments A-1 and A-2, in the possession of Google and Facebook, there exists evidence of violations of Title 18, United States Code, Section 2339B(a)(1).

4.      The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence of violations of Title 18, United States Code, Section 2339B(a)(1), are located in the **Subject Accounts**.

2

## BACKGROUND INFORMATION

**A.    Google**

5.    Based on my training and experience and information available from Google's website (google.com), I have learned the following information about Google, Gmail, and Google+:

a.    Google offers a collection of Internet-based services, including e-mail and online data storage, which is owned and controlled by Google. The services are available at no cost to Internet users, though there are certain options, such as additional online data storage, that users may elect to pay money to receive. Subscribers obtain an account by registering on the Internet with Google and providing Google with basic information, including name, gender, zip code, and other personal/biographical information. Subscribers are given a Google account which ends in "@gmail.com" which is utilized to access these online services.

b.    Google maintains electronic records pertaining to the individuals and entities who maintain Google online subscriber accounts. These records often include account access information, e-mail transaction information, account application information, and in some circumstances billing and payment information.

c.    Any e-mail that is sent to a Google online account subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceeds the storage limits preset by Google. If the message is not deleted by the subscriber, the account is below the maximum

3

storage limit, and the subscriber accesses the account periodically, that message can remain on Google's servers indefinitely.

d.     When a subscriber sends an e-mail, it is initiated by the user, transferred via the Internet to Google's servers, and then transmitted to its end destination. Google online account users have the option of saving a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google server, the e-mail may remain on the system indefinitely.

e.     Google online account subscribers can store files, including but not limited to e-mails, documents, and image files, on servers maintained and/or owned by Google. The online data storage service is known as "Google Drive."

f.     Google online account subscribers can also utilize a feature known as "History" that allows a user to track various historical account activity, including past Google Internet searches performed, information regarding devices which have been used to login to the Google online account, and physical location information regarding from where the Google online account was accessed.

g.     Google keeps records that can reveal accounts accessed from the same electronic device, such as the same computer or mobile phone, including accounts that are linked by "cookies," which are small pieces of text sent to the user's Internet browser when visiting websites.

h.     Google online account subscribers can also utilize Google+, which is an online social medium on which users can post personal information and

4

commentary, photographs, videos, and other information. Google+ permits users to invite and/or request other users to their "circles," thereby allowing other users to, among other things, share information and updates. To establish a "circle" relationship on Google+, a user seeking to friend another user typically sends a request to join that user's "circle," which can be accepted, rejected, or ignored by the other user.

6.      Therefore, the computers of Google are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Google, such as account access information, transaction information, and account application. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Google, to protect the rights of the subjects of the investigation and to effectively pursue this investigation, authority is sought to allow Google to make a digital copy of the entire contents of the information subject to seizure specified in Section II of Attachment A-1. That copy will be provided to me or to any authorized federal agent. The contents will then be analyzed to identify records and information subject to seizure pursuant to Section III of Attachment A-1.

B.      **Facebook**

7.      Based on my training and experience, I have learned the following about Facebook:

a.      Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook

5

allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

b.     Facebook asks users to provide basic contact information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, contact e–mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

c.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

d.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can

6

exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

e.      Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

f.      Facebook allows users to upload photos and videos.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them. Photos taken by a digital camera or smartphone typically include an Exchangeable Image File ("EXIF") data, which often includes the

7

date, time, type of device, and geolocation for the photo. Facebook removes EXIF data from photos that are uploaded by users, but retains a copy of that information.

g. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

h. If a Facebook user does not want to interact with another user, the first user can "block" the second user from seeing his or her Facebook account.

i. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

j. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

k. Each Facebook account has an activity log, which is a list of the

8

user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

l.     A Facebook user may opt for "notifications" of many of the above listed events (e.g., receiving a message or a friend request) to be sent to an email address associated with the user's Facebook account. From personal experience, I know that in the case of messages, this "notification" email includes the entire text of the message from the user's Facebook Inbox.

m.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

n.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

o.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

9

p.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

q.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

r.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

10

s.  Facebook keeps records that can reveal accounts accessed from the same electronic device, such as the same computer or mobile phone, including accounts that are linked by "cookies," which are small pieces of text sent to the user's Internet browser when visiting websites.

t.  Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

8.  Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Facebook to make a digital

11

copy of the entire contents of the information subject to seizure specified in Section II of Attachment A-2. That copy will be provided to me or to any authorized federal agent. The contents will then be analyzed to identify records and information subject to seizure pursuant to Section III of Attachment A-2.

9.      At various points in the Affidavit, I offer my interpretations of certain communications in brackets and otherwise. These interpretations, which include translations of certain words and phrases in the Arabic language, are based on my knowledge of the investigation to date and review of prior communications, the contents and context of the communications, prior and subsequent communications, conversations with other law enforcement officers and agents, conversations with one or more Arabic translators employed by the FBI, and my experience and familiarity with terrorist organizations generally. Some of these summaries do not include references to all the topics covered during the course of the communications. In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned. Finally, quotations from written communications are as they appear in their original form, including any grammatical or spelling errors. Although transcribers have attempted to transcribe the communications accurately, to the extent that quotations from these communications are included, these are preliminary, not final, transcriptions.

## II. FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT ACCOUNTS

10.     On or about April 11, 2017, defendants JOSEPH D. JONES and EDWARD SCHIMENTI were charged by criminal complaint with conspiring and attempting to provide material support and resources, namely, personnel and equipment, to a foreign terrorist organization, namely, the Islamic State of Iraq and al-Sham (ISIS), knowing that the organization was a designated terrorist organization, and that the organization had engaged in and was engaging in terrorist activity and terrorism, in violation of Title 18, United States Code 2339B(a)(1). JONES and SCHIMENTI were arrested on or about April 12, 2017.

11.     As set forth in the complaint, which is incorporated here by reference and attached to this affidavit as Exhibit 1, JONES and SCHIMENTI each provided cellular telephones to an individual whom, unbeknownst to JONES and SCHIMENTI, was an FBI Confidential Human Source (the CHS).[1] JONES and SCHIMENTI provided these cellular telephones to the CHS with the belief and understanding that they would be transported by the CHS to ISIS-controlled territory and provided to ISIS for use in assembling improvised explosive devices (IEDs) to conduct violent attacks.

12.     In addition, JONES and SCHIMENTI worked together to prepare and support the CHS's purported travel overseas to fight on behalf of ISIS. Specifically,

---

[1] To date, the CHS has been paid approximately $14,855 by the FBI. All of the payments, with the exception of approximately $500, were used to cover investigation related expense.

13

SCHIMENTI expressed support for the CHS's plans to travel to fight on behalf of ISIS, helped the CHS improve his physical fitness so he would be prepared to fight with ISIS, counseled the CHS to be cautious to avoid detection by law enforcement, and introduced the CHS to JONES, for the purpose of JONES introducing the CHS to a purported ISIS facilitator who would assist the CHS with joining ISIS. JONES, in turn, introduced the CHS to an individual whom JONES believed operated an ISIS facilitation network capable of delivering the CHS to ISIS-controlled territory in Syria.

13. As set forth in paragraphs 15 to 26 of Exhibit 1, JONES used two Google accounts to express his support for violent jihad and ISIS. For example, as set forth in paragraph 15 of Exhibit 1, JONES used the email account Only1Not3@gmail.com (**Subject Account 1**) to email an undercover FBI employee photos of himself and SCHIMENTI posing with an ISIS flag in front of a partially obscured sign that reads, "Welcome to Illinois Beach State Park." Similarly, JONES used the Google+ account Yusuf Abdulhaqq[2] (**Subject Account 2**) to promote ISIS (e.g., Exhibit 1, ¶¶ 21 and 23), post an essay supporting martyrdom and jihad (Exhibit 1, ¶ 22), and distribute ISIS videos, including a video on stabbing techniques (Exhibit 1, ¶ 25).

14. On or about April 12, 2017, after his arrest, JONES waived his Miranda rights orally and in writing and agreed to be interviewed. During that interview,

---

[2] Google+ allows a user to change the name on their account. The name on **Subject Account 2** is currently Yusuf Abdulhaqq. At the time JONES made the posts discussed in the criminal complaint, the user name was Yusuf Abdulahad.

JONES admitted that **Subject Account 1** was his Google+ account. JONES further stated that **Subject Account 1** was used exclusively by him.

15.     As set forth in paragraphs 27 to 33 of Exhibit 1, SCHIMENTI used a Google account and a Facebook account to express his support for violent jihad and ISIS. For example, SCHIMENTI used Google+ account Ed Schmenti (**Subject Account 3**)[3] to post messages, including, "Kuffar [unbelievers], we are coming to slay you" (Exhibit 1, ¶ 28), "Islamic State will control your country . . ." (Exhibit 1, ¶ 29), "May Allah reward this brother who has left his family and life to fight for establishment of the Islamic State . . ." (Exhibit 1, ¶ 30), and "IF YOU CAN'T MAKE HIJRAH [travel to fight jihad] THEN SLAUGHTER THE PAGANS NEXT TO YOU" (Exhibit 1, ¶ 31). Similarly, using **Subject Account 4**, SCHIMENTI posted, "I love my brothers/sisters fighting 2 expand territory of Islamic State [ISIS] . . ." (Exhibit 1, ¶ 33).

16.     On or about April 12, 2017, after his arrest, SCHIMENTI waived his Miranda rights orally and in writing and agreed to be interviewed. During that interview, SCHIMENTI admitted that the Google+ account "Ed Schmenti" (**Subject Account 3**) was his Google+ account.

---

[3] Due to a typographical error, the criminal complaint described the user name of **Subject Account 3** as "Ed Schimenti." In fact, the user name of that account is "Ed Schmenti."

15

17.     Based on my training and experience in other investigations, I believe that a search of email provider account contents often of individuals engaged in criminal conduct yields investigative leads relating to:

a.     the identities of co-conspirators and other individuals engaged in conspiring and attempting to provide material support to a foreign terrorist organization;

b.     the contact information of co-conspirators, customers, and other individuals engaged in conspiring and attempting to provide material support to a foreign terrorist organization; and

c.     the timing of communications among co-conspirators, customers, and other individuals involved in conspiring and attempting to provide material support to a foreign terrorist organization.

## III.    SEARCH PROCEDURE

18.     In order to facilitate seizure by law enforcement of the records and information described in Attachment A-1, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to permit employees of Google to assist agents in the execution of this warrant. In executing this warrant, the following procedures will be implemented:

a.     The search warrant will be presented to Google personnel who will be directed to the information described in Section II of Attachment A-1; and

b.     In order to minimize any disruption of computer service to innocent third parties, Google employees and/or law enforcement personnel trained

16

in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II of Attachment A-1, including an exact duplicate of all information stored in the computer accounts and files described therein.

19. Google employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A-1 and all information stored in those accounts and files to the agent who serves this search warrant; and

20. Following the protocol set out in the Addendum to Attachment A-1, law enforcement personnel will thereafter review all information and records received from Google employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A-1.

21. In order to facilitate seizure by law enforcement of the records and information described in Attachment A-2, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to permit employees of Facebook to assist agents in the execution of this warrant. In executing this warrant, the following procedures will be implemented:

a. The search warrant will be presented to Facebook personnel who will be directed to the information described in Section II of Attachment A-2; and

b. In order to minimize any disruption of computer service to innocent third parties, Facebook employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer

17

accounts and files described in Section II of Attachment A-2, including an exact duplicate of all information stored in the computer accounts and files described therein.

22. Facebook employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A-2 and all information stored in those accounts and files to the agent who serves this search warrant; and

23. Following the protocol set out in the Addendum to Attachment A-2, law enforcement personnel will thereafter review all information and records received from Facebook employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A-2.

## IV. CONCLUSION

24. Based on the above information, I respectfully submit that there is probable cause to believe that evidence of violations of Title 18, United States Code, Section 2339B(a)(1) are located within one or more computers and/or servers found at Google, headquartered at 1600 Amphitheatre Parkway, Mountain View, California, 94043 and Facebook, headquartered at 300 Constitution Drive, Menlo Park, California, 94025. By this affidavit and application, I request that the Court issue a search warrant directed to Google allowing agents to seize the electronic evidence and other information stored on the Google servers following the search procedure described in Attachment A-1 and the Addendum to Attachment A-1, and that the Court issue a search warrant directed to Facebook allowing agents to seize the electronic evidence and other information stored on Facebook servers following

18

the search procedure described in Attachment A-2 and the Addendum to Attachment

A-2.

FURTHER AFFIANT SAYETH NOT.

_____
Cassandra B. Carnright
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
before me this 14th day of April, 2017

_____
Honorable M. DAVID WEISMAN
United States Magistrate Judge

19

## ATTACHMENT A-2

### I. SEARCH PROCEDURE

1. The search warrant will be presented to Facebook personnel, who will be directed to isolate those accounts and files described in Section II below.

2. In order to minimize any disruption of computer service to innocent third parties, company employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein.

3. Facebook employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant.

4. Following the protocol set out in the Addendum to this Attachment, law enforcement personnel will thereafter review information and records received from company employees to locate the information to be seized by law enforcement personnel specified in Section III below.

### II. FILES AND ACCOUNTS TO BE COPIED BY EMPLOYEES OF FACEBOOK

To the extent that the information described below in Section III is within the possession, custody, or control of Facebook, headquartered at 1601 S. California Avenue Palo Alto, CA 94304, Facebook is required to disclose the following information to the government for the following user ID:

100005050058372

a.      All contact information for 100005050058372: including full name, user identification number, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b.      All Photoprints, including all photos uploaded by that user ID, all Exchangeable Image File (or EXIF) data associated with those photos, including date, time, type of device, and geolocation information, and all photos uploaded by any user that have that user tagged in them.

c.      All Neoprints, including profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

d.      All other communications and messages made or received by the user, including all private messages and pending "Friend" requests.

e.      All IP logs, including all records of the IP addresses that logged into the account.

f.      All information about the user's access and use of Facebook Marketplace.

2

g.      The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number).

h.      All privacy settings and other account settings.

i.      All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

j.      Subscriber records for all Facebook accounts associated with the user ID: 100005050058372, by cookies, recovery email address, or telephone number.

## III.   Information to be Seized by Law Enforcement Personnel

All information described above in Section II that constitutes evidence concerning violations of Title 18, United States Code, Section 2339B(a)(1), as follows:

1.      Items related to the Islamic State of Iraq and the Levant ("ISIL"), the Islamic State of Iraq and Syria ("ISIS"), Abu Bakr al-Baghdadi, jihad, terrorism, martyrdom, bayah, weapons or physical training, and any individuals or organizations associated with the above.

2.      Items related to the commission of acts of violence in the United States or overseas, including justifications for such conduct, the selection of a target or targets, the logistics of such conduct, and any tools or weapons to be used in such conduct.

3.      Items related to the purchase of cellular phones.

4.  Communications with UC1, UC2, UC3, UC4, CHS, and JOSEPH JONES.

5.  Items concerning the ownership, use or control of the **Subject Accounts.**

6.  All of the records and information described in Section II (e), (f), (g), (i), and (j).

4

## ADDENDUM TO ATTACHMENT A-2

With respect to the search of any information and records received from the social network provider, law enforcement personnel will locate the information to be seized pursuant to Section III of Attachment A-2 according to the following protocol.

The search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.  searching for and attempting to recover any hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

b.  surveying various file directories and the electronic mail, including attachments thereto to determine whether they include data falling within the list of items to be seized as set forth herein;

c.  opening or reading portions of electronic mail, and attachments thereto, in order to determine whether their contents fall within the items to be seized as set forth herein; and/or

d.  performing key word searches through all electronic mail and attachments thereto, to determine whether occurrences of language contained in such electronic mail, and attachments thereto, exist that are likely to appear in the information to be seized described in Section III of Attachment A-2.

Law enforcement personnel are not authorized to conduct additional searches on any information beyond the scope of the items to be seized by this warrant.

# EXHIBIT 1

UNITED STATES DISTRICT COURT    )
                                )
NORTHERN DISTRICT OF ILLINOIS   )

### AFFIDAVIT

I, Cassandra B. Carnright, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately March 2016.

2.      As part of my duties as an FBI Special Agent, I investigate criminal violations relating to international terrorism, including providing and conspiring, and attempting to provide, material support or resources to foreign terrorist organizations, in violation of Title 18, United States Code, Section 2339B(a)(1). As a result of my training and experience, to include information provided by other federal agents with applicable knowledge, I am familiar with the tactics, methods, and techniques used by terrorist networks and their members. In addition, I have participated in the execution of multiple federal search warrants.

3.      This affidavit is made in support of a criminal complaint alleging that JOSEPH D. JONES, a/k/a "Yusuf Abdulhaqq," and EDWARD SCHIMENTI, a/k/a "Abdul Wali," have violated Title 18, United States Code, Section 2339B(a)(1).

4.      This affidavit is also submitted in support of an application for a warrant to search a single family home located at [redacted] in Zion, Illinois (**Subject Premises**).

5.      This affidavit is also submitted in support of a warrant to search the following electronic devices:

a.      A black Samsung cellular phone, assigned telephone number (773) 699-XXXX and used by JONES (**Subject Phone 1**).

b.      A black LG cellular phone, assigned telephone number (224) 430-XXXX and used by SCHIMENTI (**Subject Phone 2**).

c.      Because this affidavit is submitted for the limited purpose of establishing probable cause in support of securing search warrants and for a criminal complaint charging JONES and SCHIMENTI with conspiring and attempting to provide material support and resources, namely, personnel and equipment, to a foreign terrorist organization, namely, the Islamic State of Iraq and al-Sham (ISIS), knowing that the organization was a designated terrorist organization, and that the organization had engaged in and was engaging in terrorist activity and terrorism, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint, and that evidence of this offense will be found at or within the places and items to be searched.

6.      At various points in the Affidavit, I offer my interpretations of certain communications in brackets and otherwise. These interpretations, which include translations of certain words and phrases in the Arabic language, are based on my knowledge of the investigation to date and review of prior communications, the contents and context of the communications, prior and subsequent communications,

conversations with other law enforcement officers and agents, conversations with one or more Arabic translators employed by the FBI, and my experience and familiarity with terrorist organizations generally. Some of these summaries do not include references to all the topics covered during the course of the communications. In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned. Finally, quotations from written communications are as they appear in their original form, including any grammatical or spelling errors. Although transcribers have attempted to transcribe the communications accurately, to the extent that quotations from these communications are included, these are preliminary, not final, transcriptions.

**OVERVIEW**

7.     As described in more detail below, JONES and SCHIMENTI have conspired and attempted to provide material support and resources, namely, personnel and cellular telephones, to a designated foreign terrorist organization, namely, ISIS. Specifically, JONES and SCHIMENTI each provided cellular telephones to an individual whom, unbeknownst to JONES and SCHIMENTI, was an FBI Confidential Human Source (the CHS).[1] JONES and SCHIMENTI provided these cellular telephones to the CHS with the belief and understanding that they would be transported by the CHS to ISIS-controlled territory and provided to ISIS for use in assembling improvised explosive devices (IEDs) to conduct violent attacks.

---

[1] To date, the CHS has been paid approximately $14,855 by the FBI. All of the payments, with the exception of approximately $500, were used to cover investigation related expense.

3

8. In addition, JONES and SCHIMENTI worked together to prepare and support the CHS's purported travel overseas to fight on the behalf of ISIS. Specifically, SCHIMENTI expressed support for the CHS's plans to travel to fight on behalf of ISIS, helped the CHS improve his physical fitness so he would be prepared to fight with ISIS, counseled the CHS to be cautious to avoid detection by law enforcement, and introduced the CHS to JONES, for the purpose of JONES introducing the CHS to a purported ISIS facilitator who would assist the CHS with joining ISIS. JONES, in turn introduced the CHS to an individual whom JONES believed operated an ISIS facilitation network capable of delivering the CHS to ISIS-controlled territory in Syria.

**The Islamic State of Iraq and al-Sham**

9. On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

10. On May 15, 2014, the Secretary of State amended the designation of AQI as a FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary also added the following aliases to the FTO listing: The Islamic State of

4

Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

11.     Based on my training and experience: (a) Sunni extremists and others, who are not citizens or residents of Syria and Iraq, have been traveling to Syria and Iraq to join ISIS and commonly enter Syria by crossing the border from Turkey; (b) Abu Bakr al-Baghdadi is the current leader of ISIS and is frequently referred to as "Khalifa" or "Khalifa Abu Bakr al-Baghdadi"; (c) the terms "dowlah," "dawlah," "dowla," and "dawla" are Arabic terms that mean country or state and are commonly used to refer to ISIS, which is also known as "the State;" and (d) ISIS maintains a flag with a black background and white letters, written in Arabic on the top, translated to "There is no God but Allah." In the middle of the flag is a white circle containing black lettering translated to, "Mohammed is the Messenger of Allah".

**JOSEPH D. JONES**

12.     According to State of Illinois identification records, JONES is a 35-year-old, who resides at [redacted] in Zion, Illinois (**Subject Premises**). Based on surveillance, law enforcement agents familiar with the physical appearance of JONES have observed him at the **Subject Premises** on numerous occasions. More specifically, agents have observed JONES present at the **Subject Premises** on or

5

about June 16, 2016, December 13, 2016, and March 26, 2017. Additionally, following a meeting between an FBI undercover employee (UC1) and JONES, UC1 dropped JONES off at the **Subject Premises**. Similarly, the CHS observed JONES at the **Subject Premises** on or about February 24, 2017 and March 26, 2017.

### EDWARD SCHIMENTI

13.     According to Illinois driver's license records, SCHIMENTI is a 35-year-old who resides in Zion, Illinois.

### PROBABLE CAUSE IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS

14.     As set forth in more detail below, law enforcement is conducting an investigation of JONES and SCHIMENTI's conspiracy to provide material support and resources to ISIS. In approximately September 2015, JONES was introduced to an FBI undercover employee, UC1, who informed JONES that he was preparing to travel to the Middle East to join ISIS with the assistance of a purported ISIS facilitator. JONES later introduced UC1 to SCHIMENTI. JONES and SCHIMENTI expressed support for UC1's plans to travel to ISIS-controlled territory in the Middle East and fight on behalf of ISIS.

15.     UC1 later introduced JONES and SCHIMENTI to another FBI undercover employee (UC2), who could purportedly facilitate travel to ISIS-controlled territory. In or about May 2016, JONES and SCHIMENTI believed that UC1 traveled to Syria with the help of UC2. Afterwards, UC2 informed JONES that UC1 had successfully joined ISIS. Later, JONES introduced another FBI undercover employee

6

(UC4), whom JONES had met online, to UC2 to facilitate UC4's travel to Syria to fight on behalf of ISIS. In or around January 2017, JONES and SCHIMENTI believed that UC4 traveled to Syria to fight on behalf of ISIS.

16. In approximately November 2016, SCHIMENTI met the CHS, who purportedly was from Iraq and had a brother who was an ISIS member. SCHIMENTI explained to the CHS that SCHIMENTI was a supporter of ISIS who believed in violent jihad. After the CHS expressed a desire to return to the ISIS-controlled territory in the Middle East to fight on behalf of ISIS, SCHIMENTI introduced the CHS to JONES, who was in contact with UC2, who had a purported ISIS facilitation network. JONES then introduced the CHS to UC2 to facilitate the CHS's travel to fight on behalf of ISIS. JONES and SCHIMENTI also provided the CHS with cellular telephones with the understanding that the phones would be used as detonators for overseas IED attacks by ISIS.

**JONES's Online Activity**

17. Based in part on emails received by an online FBI undercover employee (UC3), whom JONES believed was an ISIS supporter located in the Chicagoland area, as well as other information as set forth in this Affidavit, the email account "Only1Not3@gmail.com" appears to belong to JONES. For example, on or about April 22, 2016, JONES, using Communication Platform 1, told UC3 that he (JONES) was going to send an email containing a picture. During this conversation, JONES informed UC3 that JONES was in one of the photos, an individual who goes by "Abdul Wali" was in the other picture (as set forth below, Abdul Wali is an alias used by

7

SCHIMENTI), and that the picture was taken "close to home." The next day, UC3 received an email from Only1Not3@gmail.com, containing a picture of an individual holding what appears to be the flag used by ISIS. In the background of the picture, below, is a sign that states "Welcome to Illinois" with additional words that are partially blocked but appear to be "Beach State Park."[2] From my training and experience, and based upon information provided to me by other federal agents, it appears that the flag in the picture is the ISIS flag. JONES requested UC3 share this picture to the UC3's Google+ account with the caption "Support from dar ul kuffar [the land of infidels]!" The following is a screen capture of these images:

 

---

[2] Illinois Beach State Park is located in Zion, Illinois.

18. JONES has been identified as the former user of a Facebook account with the user name "Yusuf Abdulahad."[3] An open source search for social media accounts using the name "Yusuf Abdulahad" resulted in the identification of a Google+ account with the user name "Yusuf Abdulahad."[4] I have compared the publicly available photograph of the person who appears to be the user of Google+ account Yusuf Abdulahad as it appeared in or about April 2015, to JONES's State of Illinois identification card photograph and they appear to depict the same person. I have also showed the publically available photo from Google+ account Yusuf Abdulahad to the CHS, who has met JONES on multiple occasions, and the CHS has identified the photo as JONES.

19. Numerous statements in support of ISIS and violent jihad have been posted using Google+ account Yusuf Abdulahad. Because, as described above, JONES appears to be the user of this account, and because JONES later discussed his support for violent jihad when he met in person with the UCs and CHS as set forth beginning in paragraph 34 of this affidavit, I believe that JONES authored these posts. For

---

[3] The user of this account publicly posted his location as Chicago, Illinois and his date of birth as February 27. According to State of Illinois identification card records, JONES's month and day of birth are February 27. In addition, the Facebook profile photo for this account contained an image that appears to be the same individual depicted on JONES's state identification card.

[4] Based on my training and experience, I know that Google+ is an online social medium on which users can post personal information and commentary, photographs, videos, and other information. Google+ permits users to invite and/or request other users to their "circles," thereby allowing other users to, among other things, share information and updates. To establish a "circle" relationship on Google+, a user seeking to friend another user typically sends a request to join that user's "circle," which can be accepted, rejected, or ignored by the other user.

example, in or about March and April 2015, JONES posted on Google+ account Yusuf Abdulahad the following statements.

- "Relying on man made system will only continue our slaughter at the hands of the filthy disbelievers claiming to protect us."

- "They lie so much the media said 2 weeks ago the city was taken from Islamic State...May Allah curse the wicked and aid the mujahideen [mujahideen refers to individuals engaged in jihad]."

- "Brother there is no such thing as a moderate Muslim. That is the name Kaffirs [non-believers] give to weak minded material loving sellouts. The intention of these people is to put kafir in a ruling position instead of Allah."

- "So I was searching eBay for a black islamic flag...nothing but filthy shia and iranian flags pop up."

20. Also using Google+ account Yusuf Abdulahad, JONES authored publically-available posts arguing against other Google+ users who did not share JONES's support for violent extremism. For example, in a May 2015 exchange with another Google+ user, JONES stated, "No one else gives a dam about ruling by Islam no one else is fighting against oppression of the believers so please do not disrespect the mujahedeen [jihadi fighters] of Iraq Syria West Africa or any in the world."

21. Similarly, on or about April 16, 2015, JONES posted an article, "Interview with an Islamic State Correspondent," using Google+ account Yusuf

10

Abdulahad. The article promoted ISIS and claimed that ISIS has been successful in its military operations because of its "intelligence forces", implementation of snipers, and use of IEDs.

22. Similarly, on or about May 13, 2015, using Google+ account Yusuf Abdulahad, JONES posted an essay, "Jihad: The Forgotten Obligation." The essay includes statements such as, "Jihad is the best deed and the best grade of jihad is Shahadah [martyrdom] which the Shaheed [martyr] has achieved." The essay also states that "It is clear from this Hadith that the person who does Jihad in Allah's path is more superior than other Muslims," and "Allah's love and blessing is with those who demonstrate their commitment by sacrificing their lives and wealth for Allah." Further, the essay indicates that, "Muslims should remain experienced in the war tactics and weapons of war. They should keep all sorts of arms and weapons ready in order to benefit from the reward and subsequently would not feel shamed and inadequate when it is required."

23. On or about May 20, 2015, using Google+ account Yusuf Abdulahad, JONES posted a document, "A Brief Guide to the Islamic State [2015]". The document appears to be, in essence, a 46-page traveler's guide to the Islamic State that includes information on food, weather, transportation, technology, people, and education in ISIS's self-proclaimed caliphate. The Guide notes that U.S. airstrikes kill multiple civilians in the Islamic State and argues that the lives of Iraqis and Syrians are now better off because of the Islamic State. The Guide concludes, "When we descend on

11

the streets of London, Paris, and Washington the taste will be far bitterer, because not only will we spill your blood, but we will also demolish your statues, erase your history, and, most painfully, convert your children who will then go on to champion our name and curse of their forefathers." The following is a screen capture of this posting:





12

24.     On or about July 12, 2015, JONES, using Google+ account Yusuf Abdulahad, shared publicly an audio message by ISIS's Al-Furquan Media.[5] The message was entitled, "A message to the Mujahideen and to the Muslim Ummah [nation] by Abu Bakr al-Baghdadi." In this 19 minutes and 47 seconds audio message, Abu Bakr al-Baghdadi, the leader of ISIS, called upon Muslims to act against global oppression and to emigrate to the newly-declared caliphate. The following is a screen capture of this posting:



25.     In addition to publicly posting his support of ISIS, JONES made private posts supporting ISIS. For example, on or about October 22, 2015, JONES shared privately a video originally shared by Google+ Community which translates to, "the Glare of the Caliphate."[6] The video is titled "Some of the Deadly Stabbing Ways: Do not Forget to Poison the Knife." The video is one minute and 12 seconds long. It was originally produced by "Ajnad Foundation For Media Production," one of ISIS's media

---

[5] As explained in paragraph 10 above, Al-Furquan Establishment for Media Production is a designated alias of ISIS.
[6] This posting was observed by UC3, who had friended JONES online, and therefore received JONES's non-public posts.

13

foundations. Pictured below is a screen shot from the video which features two masked individuals who appear to illustrate some deadly stabbing methods, including stabbing the heart, the neck, the abdomen, and the legs. The following is a screen capture of this posting:



26.    According to subpoenaed telephone records, phone number (773) 699-XXXX (**Subject Phone** 1) is subscribed to JONES by a variation of his name, with the **Subject Premises** listed as the address for the account.

**SCHIMENTI's Online Activity**

27.    SCHIMENTI has been identified as the former user of a Google+ account with the user name "Ed Schimenti." Specifically, according to subpoenaed subscriber information, telephone number (224) 430-XXXX (**Subject Phone** 2) is associated with the Google+ account Ed Schimenti. Based on information provided by a credit agency, **Subject Phone 2** is assigned to SCHIMENTI. In addition, as described

14

below, SCHIMENTI identified **Subject Phone 2** as his phone during a meeting with UC1 and UC2.

28.     Numerous statements in support of ISIS and violent jihad have been posted using Google+ account Ed Schimenti. Because, as described above, SCHIMENTI appears to be the user of this account, and because SCHIMENTI later discussed his support for violent jihad when he met in person with the UCs and CHS as set forth beginning in paragraph 34 of this affidavit, I believe that these posted were authored by SCHIMENTI. For example, on the publicly available portion of Google+ account Ed Schimenti, on or about April 3, 2015, SCHIMENTI authored a post stating, "Kuffar [unbelievers], we are coming to slay you." The following is a screen capture of this posting:

 **Ed Schmenti**

Kuffar, we are coming to slay you.

+1

29.     Further, on the publicly available portion of Google+ account Ed Schimenti, on or about April 23, 2015, SCHIMENTI commented, "Islamic State will control your country, matter of fact, Islam will dominate the world!!" The following is a screen capture of this posting:

15

+1

Hide comments ˄

**Ed Schimenti**
Islamic State will control your country, matter of fact, Islam will dominate the world"

30.    Further, the publicly available portion of Google+ account Ed Schimenti, on or about May 10, 2015, displayed the ISIS flag and depicted an individual associated with the designated foreign terrorist organization Boko Haram claiming credit for attacks on Lagos and Abuja, Nigeria. In a posting, SCHIMENTI stated, "May Allah reward this fierce mujahideen who uses his life, body, and earthly might to make Allah's Law govern all, may Allah reward him for striking fear in the hearts of the taghut and the disbelievers in general." SCHIMENTI continued his comments regarding this Boko Haram post by saying, "May Allah reward this brother who has left his family and life to fight for establishment of the Islamic State...I love him...what can the kuffar do.? They have noone..." The following is a screen capture of this posting:

16



Ed Schmenti

May Allah reward this fierce mujahideen who uses his life, body and earthly might to make Allah's Law govern all, may Allah reward him for striking fear in the hearts of the taghut and the disbelievers in general, Alaaaahu Akbaaaar.



Boko Haram chief claims Lagos & Abuja attacks, moc...

+1

Ed Schmenti commented on a video on YouTube.

May Allah reward this brother who has left his family and life to fight for establishment of Islamic State and makes it clear that victory comes only thru Allah azzawaja I.. love him. Alhamdulillah, what can the kuffar do? They have noone, we have Allah and truly the Party of Allah is the victorious Party.

Boko Haram chief claims Lagos & Abuja attacks, moc...

31. Further, based on the publicly available portion of Google+ account Ed Schimenti, on or about June 7, 2015, SCHIMENTI posted a photograph of a masked individual holding a knife with the ISIS flag in the background, and the caption of this photo stated, "IF YOU CAN'T MAKE HIJRAH [travel to fight jihad] THEN SLAUGHTER THE PAGANS NEXT TO YOU." The following is a screen capture of this posting:

17



32.     SCHIMENTI has been identified as the former user of a Facebook account with the vanity name "Ed Schimenti." I compared the photograph posted on the Facebook account Ed Schimenti, photo below, to a photograph of SCHIMENTI contained in Illinois driver's license records and they appear to be the same person. In addition, the CHS, who has met SCHIMENTI on several occasions, identified the photograph posted through the Facebook account Ed Schimenti as SCHIMENTI. The following is a screen capture of this posting:

18



33.     SCHIMENTI has posted numerous statements in support of ISIS and violent jihad using the Facebook account Ed Schimenti. For example, on the publicly available portion of the Facebook account Ed Schimenti, in or about December 2014, SCHIMENTI posted, "I like 2 spread Islam. It's where I found my honor/worth. I love my brothers/sisters fighting 2 expand territory of Islamic State/all Muslims. 2 the CIA on Facebook, Muslims are a lil smarter. Just had convo's w/2spies playing good cop/bad cop asking about my allegiance...6/29/2014!" The following is a screen capture of this posting:



**Ed Schimenti**
Yesterday at 3:23pm · Edited ·

I like 2 spread Islam.It's where I found my honor/worth.I love my brothers/sisters fighting 2 expand territory of Islamic State/all Muslims.2 the CIA on Facebook, Muslims are a lil smarter.Just had convo's w/2 spies playing good cop/bad cop asking about my allegiance....6/29/14!

Like · Comment · Share

19

### JONES's and SCHIMENTI's Meetings with UCs 1 and 2

34.    On or about September 1, 2015, an FBI undercover employee (UC1) introduced himself/herself to JONES at the Zion Police Department in Zion, Illinois.[7] As part of a ruse, UC1 posed as a recently detained individual brought into the police department for questioning after a traffic stop. During this meeting, UC1 and JONES exchanged their contact information and agreed to communicate through Communication Platform 2.

35.    On or about September 2, 2015, UC1 and JONES began to communicate through Communication Platform 2. For example, on or about September 4, 2015, UC1 asked JONES, "Do you have any good videos or articles i can read to strengthen up my deen [faith]?" In reply JONES stated, "Yes brother I will send you some inshallah [God willing]. Do you have Gmail?" UC1 provided UC1's email address so that JONES could send the videos or articles, and UC1 asked what email address JONES was going to use to send this email. JONES replied, "Only1not3@gmail.com."

36.    On or about October 6, 2015, using Communication Platform 2, UC1 informed JONES about how associates of UC1 used Communication Platform 1 to communicate with each other. Using Communication Platform 2, UC1 provided his/her username for Communication Platform 1. On or about October 7, 2015, JONES provided UC1 his username on Communication Platform 1 and added UC1 as a contact on Communication Platform 1.

---

[7] JONES had not been charged with any crime. Instead, JONES was at the police station to be interviewed regarding the murder of one of his friends.

20

37.     On or about October 8, 2015, UC1 and JONES began communicating on Communication Platform 1. During this conversation, JONES asked UC1, "Are there any other brothers on here that I could build and learn with?" UC1 responded that another individual (UC2), was also using Communication Platform 1, and that UC1 would attempt to put UC2 in contact with JONES on Communication Platform 1. UC1 described UC2 as a "knowledgeable brother and very trustworthy." JONES responded, "Don't forget about me."

38.     On or about October 19, 2015, using Communication Platform 1, JONES asked UC1, "Do you watch videos published by the Islamic State?" UC1 responded, "Akhee [Brother], I have seen some videos but I don't know how to get a hold of more...have any that you can email me?" JONES responded, "I have plenty of videos. From Syria Iraq and west Africa." UC1 asked JONES to send those videos. JONES asked for UC1's email address, and stated, "They are expanding the Islamic state [ISIS] and humiliated those who oppose."

39.     On or about October 20, 2015, at approximately 7:44 a.m., JONES used Only1Not3@gmail.com to send two ISIS videos to UC1. Both videos appeared to portray ISIS fighters conducting acts of violence, such as executions by beheadings and shooting restrained individuals in the head.

40.     Later on or about October 20, 2015, using Communication Platform 1, UC1 and JONES discussed the videos. UC1 asked JONES, "Were those brothers soldiers from the Islamic State trying to establish the caliphate in Africa?" JONES

21

replied, "yes they are from the Islamic state and those brothers have given bayah [an oath or allegiance] to the Khilafah [leader of ISIS]." Furthermore, JONES stated, "I will send more. Have you saw the Flames of war video?" UC1 asked JONES, "have you ever thought about going over to the caliphate [ISIS]?" JONES replied, "Every night and day. U?" UC1 responded, "Same here." JONES told UC1, "The more I see the expansion of the Islamic state the stronger my faith grows. I always pray for them to continue expanding and for us here in this part of the world's top get a better understanding of the truth." JONES concluded the discussion by saying, "I will send a video that shows brothers from all over the world speaking about living in the land of Khilafah even their children. All races and colors living together SubhanAllah [greatness of God]."

41. On or about October 24, 2015, using Communication Platform 1, UC1 informed JONES that UC2 and UC1 had plans to travel through Chicago, Illinois, on approximately October 30, 2015. During this conversation, UC1 asked JONES if he wanted to meet up with UC1 and UC2. JONES responded, "yes that would be great. I live and work in the same town of zion Illinois that you saw met me in. Let me know. Alhumdulillah [praise be to God] I will try my best to make myself available just give me the heads up."

42. On or about October 30, 2015, UC1 and UC2 met with JONES at a location in Waukegan, Illinois, which was suggested by JONES. During this meeting, which was audio recorded, JONES introduced UC2 and UC1 to SCHIMENTI, who

22

introduced himself as Abdul Wali. After this portion of the meeting, JONES, SCHIMENTI, UC1, and UC2 traveled to a local restaurant. While at the restaurant, SCHIMENTI provided his phone number as **Subject Phone 2**. SCHIMENTI confided in UC1 and UC2 that he watched Anwar Awlaki materials[8] and supported ISIS.

43.    On or about November 13, 2015, using Communication Platform 1, JONES sent UC1 a link to an online news article containing an ISIS video. The headline of the news article was, "ISIS Beheads 4 Peshmerga Fighters." The article described the video as "a new video purportedly released by the Islamic State, [in which] three Kurdish soldiers are forced to watch a fellow Peshmerga get beheaded before being beheaded." JONES instructed UC1 to, "Watch the video til the end had English at the end addressing Obama." The portion toward the end of the video contains spoken English and shows the Peshmerga soldiers being beheaded.

44.    During this same discussion on or about November 13, 2015, UC1 asked JONES, "Have you been watching the news going on right now in Paris?" UC1 was referring to what news outlets described as the Paris Massacre, in which at least 128 people were killed by gunfire and blasts according to French officials. JONES responded, "Yes I just saw it on TV at work as I was going to make magrib [Islamic prayers]. Can you say imam [faith] booster!" During this conversation, UC1 informed

---

[8] Anwar al-Awlaki is a deceased member of Al-Qaeda in the Arabian Peninsula. Al-Awlaki has encouraged violent attacks against the West.

23

JONES that UC1 was going to contact UC2 to determine, "what more I can do to prepare myself for this war."

45.    Between on or about November 23, 2015 and November 24, 2015, using Communication Platform 1, UC1 stated to JONES, "Assalmalaikum [peace be upon you] Akhee [brother] I saw on the news today that armed kuffars [non-believers] are watching masjids. Be careful and watch yourself. Havent from you in a while everything ok?" JONES responded, "Yes evertyhing is OK. Jazakallah khairn for your concern. Mashallah brother I really need knowledge. I am so ready to go." Based on my training and experience, and information provided to me by other federal agents, I believe JONES meant he wanted to travel overseas to join ISIS.

46.    On or about November 25, 2015, using Communication Platform 1, JONES asked UC1, if he has ever taken a course of jihad. UC1 and JONES then had a discussion regarding the meaning of jihad. JONES then asked UC1 if UC1 thought that ISIS had something to do with what happened in France. UC1 stated, "From what I've seen and read I do believe the brothers did it on the behalf of the dawla [Islamic State]...and as far as the jihad, [UC2] is finding some training for me to attend." JONES then asked, "What type of training? Do you think the prophet pbuh [peace be upon him] approves of the attack? I'm not condemning it. I just want to understand it." UC1 answered, "I've asked [UC2] to find training for me that would get me prepared to travel to the dawla [ISIS], survival training." JONES asked UC1 where the location would be for this training. UC1 answered by saying, "I've asked

24

[UC2] for training away from where i live and somewhere where the conditions are similar to the dawla [ISIS]." JONES then asked UC1, "I wonder why the brothers didn't attack military or police base."

47.    On or about December 19, 2015, using Communication Platform 1, UC1 informed JONES that UC1 had participated in a training camp. JONES asked UC1 what this training entailed. UC1 told JONES the training involved weapons, self-defense, and survival training with rifles and pistols. UC1 also told JONES that "another student" was able to take pictures of UC1 conducting this training and that UC1 would share those pictures with JONES the next time they were together.

48.    On or about December 22, 2015, using Communication Platform 1, UC1 informed JONES that UC1 and UC2 would be traveling through northern Illinois on or about December 29, 2015. JONES replied, "I will be waiting for your call or text."

49.    On or about about December 29, 2015, UC1 and UC2 met with JONES and SCHIMENTI in Waukegan, Illinois. During this meeting, JONES confirmed that he had given bay'ah. According to FBI linguists and translators, "bay'ah" is an Arabic word meaning an oath or allegiance to a leader or a group. Based on the context of this statement, as well as JONES's rhetoric and open source postings, I believe this is a reference to pledging bay'ah to ISIS.

50.    JONES asked if UC1 or UC2 listened to a recent speech by Abu Bakr Al-Baghdadi (the leader of ISIS). UC1 showed JONES pictures from the firearms/survival training that he purportedly attended. In response, JONES stated

25

he wanted to attend the same training. Furthermore, JONES voiced concern about attending the training due to his prior felony convictions. In addition, JONES suggested a place to shoot firearms in Lombard, Illinois.

51.    During the same meeting, JONES stated to UC1 and UC2 that SCHIMENTI wanted to talk about jihad with everybody, but SCHIMENTI should be smart and not put everyone else in jeopardy by discussing jihad so openly. JONES further stated that SCHIMENTI brought the feds into their life.[9] This meeting ended when SCHIMENTI abruptly left the meeting. He then returned to get JONES, who then left with SCHIMENTI (they had driven to the meeting together).

52.    On or about February 6, 2016, using Communication Platform 1, UC1 asked JONES if he could provide any more videos to UC1. JONES stated, "New videos all the time a brother just told me about 1." UC1 stated, "I'm not sure if you have got my messages from last week since you got your new phone. I wanted to ask you to keep me in your dua [prayers], because [UC2] informed me by the permission of Allah the window of my dreams may have been opened."

53.    On or about February 7, 2016, the conversation between JONES and UC1 continued from the previous day. During this conversation, JONES provided a link to a news outlet article with a video embedded that appears to show a child

---

[9] On or about December 12 and 16, 2015, SCHIMENTI and JONES, respectively, were each interviewed regarding a purported terrorist plot overseas after SCHIMENTI was identified in the media as a participant in the plot. Based on the investigation to date, it does not appear that JONES and SCHIMENTI were involved in this alleged plot.

26

soldier beheading a man. JONES stated when he provided the hyperlink that, "This is one of the new ones."

54. At approximately 14 minutes into this video, a man in an orange jumpsuit has his hands bound behind his back. The man is being escorted by a boy with a knife. The man in the orange jumpsuit is placed on his knees, and the boy with the knife stands behind the kneeling individual. A male voice is then heard speaking in English. The ISIS flag can be seen in the upper right corner of the video. The boy with the knife then puts the man in the orange jumpsuit in the prone position, grabs his hair to lift up his head, and decapitates the man in the orange jumpsuit while his hands are still bound behind his back. The boy with the knife then puts the decapitated head on the back of the male in the orange jumpsuit.

55. On or about February 8, 2016, the conversation between JONES and UC1 continued from the previous day. During this conversation, UC1 stated, "You know what else I'm looking for is the ISIS Islamic state flag....if i find one you want me to get you one?" JONES responded, "Yes alhumdulillah [praise be to God]. I am waiting on a brother from the iqra store to let me know if he has a flag. It's not the isis flag but black with shahada on it. Or white." JONES continued, "I thought of making one or paying someone to make it." UC1 stated, "I will find some my way and if i do i will get you one akhee. I got you." JONES responded, "I will do the same for you." Towards the end of this conversation UC1 stated, "I can't wait to leave!" JONES responded, "May Allah make it easy for you." Based on the context of the

27

conversation, I believe that JONES was referring to "Allah" making UC1's travel to ISIS-controlled territory "easy."

56. On or about February 15, 2016, using Communication Platform 1, JONES provided UC1 a link to a news article with a video embedded that appeared to show ISIS executing alleged spies by burning them alive, drowning them in cages, and strapping explosives around their neck and detonating those explosives.

57. The first segment of the video shows men in red jumpsuits speaking to the camera in Arabic. At approximately two minutes into the video, four men can be seen with their hands bound behind their back, and are escorted by individuals wearing camouflage clothing, face masks, and pistols secured in shoulder holsters. The individuals in the red jumpsuits are placed in a four-door vehicle with their hands secured to handles in the vehicle. An individual is then seen aiming what appears to be a rocket propelled grenade (RPG) at the vehicle. This individual fires the RPG at the vehicle, and the vehicle catches fire. Audible screams can be heard while the vehicle is burning.

58. The second segment of the video shows men in red jumpsuits speaking to the camera in Arabic. At approximately three minutes and 25 seconds into the video, five men are seen with their hands bound behind their back. The men are escorted by an individual wearing camouflage clothing, a face mask, and a pistol secured in a shoulder holster. The individuals in the red jumpsuits are then placed in a cage. The individual wearing camouflage clothing attaches a lock to the cage's

28

door. The cage is then lifted, by what appeared to be a crane, and fully submerged in a swimming pool filled with water. When this cage is fully submerged in the water, muffled screams can be heard. The cage is then lifted while the ISIS flag is seen in the upper right corner of the video. When the cage emerges from the water all five individuals appear to have drowned, and some have foam coming out of their mouths.

59. The third segment of the video shows men in red jumpsuits speaking to the camera is Arabic. At approximately six minutes and five seconds, seven men are seen with their hands bound behind their back. The prisoners are escorted by an individual wearing camouflage clothing, a face mask, and a pistol secured in a shoulder holster. The men in the red jumpsuits are placed on their knees, and the individual wearing camouflage clothing is seen wrapping what appears to be detonation cord around the necks of the prisoners. The video then shows all seven of the men in the video frame, after which an explosion occurs in slow motion, and the bodies are seen to be dismembered by this explosion. The video ends with another individual in a red jumpsuit who appeared to observed this execution.

60. On or about February 21, 2016, using Communication Platform 1, UC1 notified JONES that UC1 had obtained an ISIS flag for JONES, and that UC1 would be in JONES' area the week of March 7, 2016. On or about March 10, 2016, using Communication Platform 1, UC1 and JONES discussed the logistics of meeting each other on March 11, 2016. JONES requested that UC1 pick him up from his residence, and JONES provided his address, the **Subject Premises**.

29

61.   On or about March 11, 2016, UC1 met with JONES in Zion, Illinois outside of the **Subject Premises**. JONES and UC1 then went to coffee shop. During this meeting, UC1 advised JONES that UC1 would be leaving to join "Dawla Islamiya [ISIS]" in April or May 2016 to join "Al-Baghdadi." Furthermore, during this meeting UC1 provided an ISIS flag to JONES.[10] Following this meeting, JONES requested that UC1 erase JONES's address (the **Subject Premises**) from UC1's Communication Platform 1. UC1 responded, "i ain't leaving just yet!" JONES responded, "Doesn't make a difference brother. Understand me please." UC1 then stated, "I will delete this thread and start a new one?" JONES responded, "Love you for the sake of Allah…"

62.   On or about April 21, 2016, using Communication Platform 1, UC1 informed JONES that UC1 and UC2 had made arrangements to depart from O'Hare International Airport on May 20, 2016, to begin UC1's journey to join ISIS.

63.   On or about May 12, 2016, using Communication Platform 1, UC1 informed JONES that UC1's and UC2's plans had been confirmed to depart from Chicago O'Hare International Airport on May 20, 2016. JONES stated, "You are truly a motivation and I love you for the sake of Allah…" JONES then asked if UC2 was traveling with UC1. UC1 responded that UC2 was traveling with UC1, but UC2 was

---

[10] As set forth in more detail in paragraph 18, JONES later shared online a photograph of himself and what appears to be the same ISIS flag in front of a sign at Illinois Beach State Park.

not making the full journey, and that UC2 intended to return to the United States before UC1 entered into ISIS controlled territory.

64.     On or about May 19, 2016, using Communication Platform 1, JONES stated to UC1, "Travel well brother! In Shaa Allah! [God willing] Jazakallah khairn [May God reward you with goodness]. Thank you from the bottom of my heart! Love you for the sake of Allah..."

65.     On or about June 16, 2016, using Communication Platform 1, UC2 told JONES, "i have some Islamic goods from close to the land of truth for you and our brother . . . that i need to give to you." JONES responded, "Allahu Akbar! What a blessing! How are you doing ahki [brother]? How was the trip? How was [UC1]?" UC2 stated that UC1 was doing well, and trying to understand how it works overseas. UC2 informed JONES that UC2 was staying the night in the Chicagoland area and wanted to meet with JONES later that day because there were photographs to show JONES of UC1's and UC2's journey. JONES agreed to meet with UC2 during the evening on or about June 16, 2016. UC2 agreed to pick up JONES from his residence (the **Subject Premises**).

66.     On or about June 16, 2016, UC2 met with JONES in Zion, Illinois, outside of the **Subject Premises**. UC2 and JONES obtained food to go from a restaurant and then traveled to another location in Waukegan. Afterwards, UC2 dropped JONES back off at the **Subject Premises**. While sitting in UC2's car, UC2 explained the details of UC2's purported ISIS facilitation network. UC2 explained

31

the ISIS facilitation network involved Individual A, who assisted in getting individuals from the United States to Syria. UC2 explained that once the traveling individual arrived in a country bordering Syria, this ISIS facilitation network would safely transport the traveling individual across the border into Syria. Finally, once in Syria, the traveling individual will enter ISIS-held territory to begin their training to become a fighter for ISIS. During this meeting, UC2 showed pictures of UC1, UC2, and another (Individual A) purportedly traveling from North America to the Middle East, along with a portion of UC1's video explaining UC1's motivations for wanting join ISIS and fight to defend ISIS. UC2 told JONES that UC1 made the video while in the Middle East before crossing the border into Syria.

67. On or about June 17, 2016, using Communication Platform 1, JONES initiated a conversation with UC2. During this conversation, JONES inquired if UC2 was home safely. UC2 responded in the affirmative.

**JONES and UC4**

68. On or about October 26, 2015, using Communication Platform 3, JONES initiated contact online with FBI undercover employee UC4. During the ensuing conversation, JONES and UC4 agreed to communicate through Communication Platform 1.[11]

---

[11] Later on or about March 3, 2016, using Communication Platform 3, UC4 informed JONES that his previous username on Communication Platform 1 had been locked out, therefore UC4 would have to create a new username on Communication Platform 1. Subsequent communications on this platform between JONES and UC4 used the new username.

32

69.     As referenced above, on or about April 22, 2016, using Communication Platform 1, JONES sent UC4 a photo of a masked man holding the banner of ISIS, in front of a partially obscured monument which appears to display the text WELCOME TO ILLINOIS BEACH STATE PARK. The photograph appears to depict the same ISIS flag that was provided to JONES by UC1 on or about March 11, 2016.

70.     The photograph JONES provided to UC4 is as follow:



71.     On or about April 25, 2016, UC4 asked for JONES's permission to share the picture, via social media, that JONES previously provided. JONES stated that he did not mind UC4 sharing it, just not on Facebook. JONES continued by saying, "Share it with those who you trust or with the Ansar in private groups. It will boost the iman [faith] of the righteous mujahedeen [fighters] and Ansar over the world. In Shaa Allah [God willing]. Kuffar [non-believers] might report."

33

72.     From approximately August 2016 through January 2017, JONES continued to communicate with UC4, whose identity was later assumed by an FBI undercover agent in order to facilitate an in-person meeting.[12] During their communications, UC4 indicated to JONES that UC4 would like to travel to join ISIS. JONES then introduced UC4 to UC2 in order to facilitate UC4's travel to ISIS-controlled territory. In or about January 2017, UC4 informed JONES that he was traveling to Syria soon.

### SCHIMENTI, JONES and the CHS

73.     On or about December 21, 2016, an in-person conversation occurred between SCHIMENTI and the CHS, who was employed at the same place as SCHIMENTI. During this conversation,[13] according to the CHS, the CHS asked SCHIMENTI if he had heard about the attacks in Berlin. Specifically, an attack on or about December 19, 2016, during which a truck was driven into the Christmas market next to Kaiser Wilhem Memorial Church at Breitscheidplatz in Berlin, killing 12 people and injuring 56. Following the attack, ISIS stated that the attacker answered its call to target the citizens of states that are fighting against it. SCHIMENTI responded by discussing the mujahideen [fighters], the kufar [non-believers], and stated that jihad was "doing God's work."

---

[12] Because JONES believed the online individual was the same person JONES met in person, the persona will be referred to as UC4.

[13] The conversations between the CHS and SCHIMENTI that occurred at their place of employment were not recorded.

34

74. On or about December 31, 2016, the CHS and SCHIMENTI met in Bridgeview, Illinois. During this meeting, which was audio recorded, SCHIMENTI and the CHS discussed the CHS's brother. SCHIMENTI asked the CHS if the CHS's brother's friends were "from the Dawla [ISIS]." After the CHS responded in the affirmative, SCHIMENTI stated "Hamdullah [praise be to God]." SCHIMENTI further stated that people call him a "Dawla [ISIS] fanboy." SCHIMENTI admitted he was "a fan of the mujahideen [fighters]." SCHIMENTI continued, "I don't do the jihad…[recording unintelligible]… but I know what's Haqq [truth] and I know what they're doing is on the …[recording unintelligible]." The CHS told SCHIMENTI that the CHS's brother was going to love him. SCHIMENTI responded, "… I'd love to meet him, man." SCHIMENTI stated he used to think ISIS was extremist because the news only tells you negative events. During this meeting, the CHS observed an image of the ISIS flag on SCHIMENTI's cell phone (**Subject Phone 2**).

75. On or about January 8, 2017, the CHS and SCHIMENTI had a conversation while waiting outside their place of employment. During this conversation, SCHIMENTI invited the CHS into his car to talk and watch videos on SCHIMENTI's phone (**Subject Phone 2**). According to the CHS, the videos were about Islam, and referenced people that believe in jihad. SCHIMENTI discussed his dislike of "Ahmadiyya," which is the belief in fulfilling the Islamic prophecy through peace, and how he supports Muslims overseas, but does not support people who do

not support jihad. SCHIMENTI stated he has neighbors in Zion that he does not like because they do not support jihad.

76.    On or about February 6, 2017, while at their place of employment, the CHS and SCHIMENTI had a conversation. During this conversation, the CHS stated the CHS's brother was going to Syria, the CHS explained that the CHS cannot live "like this" anymore, and that the CHS wants to "go back," but is scared, and cannot stay in the United States any more. SCHIMENTI hugged the CHS twice. SCHIMENTI told the CHS that if the CHS wanted to leave, no one would care, but the CHS might not be able to come back to the United States. SCHIMENTI also told the CHS, "sometimes people here go back." After the CHS stated, "I don't know what to do," SCHIMENTI replied not to do anything until the CHS talked to him first, and to let him know before the CHS did anything. SCHIMENTI reassured the CHS "not to worry" and that "[we] can figure something out." SCHIMENTI stated that he and the CHS should talk in person, "face to face," and cautioned him not to send "anything" via text messaging. SCHIMENTI hugged the CHS again and said [he] would "figure something out."

77.    On or about February 8, 2017, the CHS met with SCHIMENTI in North Chicago, Illinois. During this meeting, SCHIMENTI told the CHS that SCHIMENTI's brother [JONES] met a long bearded brother [UC1] at a police station. SCHIMENTI further told the CHS of a brother named [UC2] and how [UC2] "supposedly" was able to facilitate travel to Dawla [ISIS]. SCHIMENTI stated that

36

because he used to be a criminal, he can see when things are a bit "fishy." Regarding [UC1] and [UC2], SCHIMENTI stated, "I don't believe them, not for one minute." SCHIMENTI stated one of "his brothers" [JONES] had the "Dawla" [ISIS] flag in his basement and that he received it from [UC1] and [UC2]. The CHS told SCHIMENTI that the CHS's brother was currently fighting for ISIS, and the CHS wanted to travel to join their brother. SCHIMENTI advised the CHS if he attempted to leave to join ISIS "it's a federal offense." SCHIMENTI also cited an example of a "brother" who attempted to join ISIS and, as a result, is currently in federal prison. SCHIMENTI asked the CHS to provide the CHS's brother's social media contact information and told the CHS that he watches Dawla [ISIS] videos every night.

78. On or about February 17, 2017, the CHS met with SCHIMENTI in Waukegan, Illinois. During this meeting, which was audio recorded, the CHS relayed a purported conversation that the CHS had with the CHS's brother that the CHS needed his passport, money, a backpack, a compass, cell phones, and that he needs to exercise for when the CHS attempts to travel overseas to join ISIS. The CHS told SCHIMENTI that the CHS's brother has been discussing drones bombing ISIS fighters. The CHS relayed information to SCHIMENTI that the ISIS fighters were tracked by the drones because the phones they were buying in Syria were compromised. The CHS further stated the CHS's brother purportedly wanted the CHS to obtain phones in the United States, and bring the phones to ISIS members overseas when the CHS travels to Syria.

79.    SCHIMENTI acknowledged the CHS's statement by stating there was a phone store next door to the restaurant they were eating at during this conversation. SCHIMENTI suggested that if the CHS wanted to, they could go talk to store representatives about obtaining cell phones. SCHIMENTI further added, "They [phone store people] are Muslim." SCHIMENTI also stated Anwar Awlaqi was bombed by drones because they were able to track him. During this conversation, the CHS also informed SCHIMENTI that the CHS was definitely leaving to join ISIS. SCHIMENTI again admonished the CHS if the CHS attempts to travel to ISIS the CHS may go to prison. Then SCHIMENTI stated, "there is a way," and that his brother [JONES] believed he has already helped "two people get to the Dawla [ISIS]" via this ISIS facilitation network. SCHIMENTI claimed he did not trust that ISIS facilitation network, but stated to the CHS, "I want this for you." Before leaving the restaurant, SCHIMENTI again asked the CHS if the CHS wanted to talk to the "phone people." The CHS declined this offer. SCHIMENTI confided in the CHS that he has pledged bay'ah [allegiance, in context, to ISIS] before, and discussed the indoctrination "classes" that people have to go through when they arrive in Dawla [ISIS].

80.    On or about February 24, 2017, the CHS met with SCHIMENTI and JONES in Zion, Illinois. The meeting took place at a gym at approximately 7:30 a.m. During this meeting, which was audio recorded, SCHIMENTI and the CHS engaged in physical training exercises. During the training, SCHIMENTI told the CHS that

38

he watches "Dawla [ISIS] training videos" and observed how fighters worked out hard, including "jumping through fire." The CHS responded that was the type of training the CHS's brother wants the CHS to go through and the CHS added, "Cause we going to fight, and not going to show the girls [our muscles]." SCHIMENTI responded, "Right, right, right...it's about that strength and that endurance." SCHIMENTI stated he previously told his brother [JONES], "Man you know I'm all big, fat...[recording unintelligible]...but inshallah [God willing] the brothers will just have me be the one to cut the neck," and added "You gotta be able to hand-to-hand." SCHIMENTI continued, "So this all goes in with that though, believe you me." SCHIMENTI stated he used to share pictures of ISIS fighters training on Facebook. SCHIMENTI also added, "To all you kuffar [non-believers] army, look at how we train." SCHIMENTI told the CHS that the gym at their place of employment opens at 5:30 a.m. every morning, and that he would meet the CHS at the gym whenever the CHS wanted to work out.

81.     During this training session, SCHIMENTI also told the CHS he was angry with a person at their job because that individual was a homosexual. SCHIMENTI stated if "Sharia [Islamic Law] comes here, we are putting you [homosexuals] on top of Sears Tower and we drop you." SCHIMENTI stated his brother Yusuf [JONES] was coming to the gym. At this point, the CHS asked if Yusuf was the person who, "Take the guys to the Dawla." SCHIMENTI responded, "Yeah yeah yeah...not him but he, he knows the guy [UC2]."

39

82.     Later, JONES arrived at the gym and introduced himself to the CHS. JONES stated he wanted to hang out with SCHIMENTI and the CHS after they leave the gym, and also let them know he was bringing his daughter with him. After JONES departed the gym, SCHIMENTI stated JONES came to the gym because he wanted to meet the CHS. SCHIMENTI stated to CHS, "I tell both of you about each other."

83.     At approximately 10:30 a.m., SCHIMENTI and the CHS exited the gym, entered SCHIMENTI's vehicle and drove to SCHIMENTI's residence. Upon arriving at SCHIMENTI's residence, the CHS stated that the CHS wanted to wait outside because the CHS wanted to smoke a cigarette. After telling SCHIMENTI multiple times that the CHS would wait outside, SCHIMENTI said, "Brother, no. I want to show you a video anyways." At this point, the CHS agreed to enter SCHIMENTI's residence. Once both were inside, SCHIMENTI showed the CHS an ISIS video of Turkish soldiers being burned alive. SCHIMENTI stated, "I don't know what they're saying but I love it." While the CHS and SCHIMENTI were watching this video, JONES arrived at SCHIMENTI's residence, and briefly talked about how SCHIMENTI was showing off at the gym. JONES then asked the CHS if the CHS was from a particular city in the Middle East, and if the CHS's family was still there. JONES stated he received a lot of updates regarding the city in the Middle East via Communication Platform 4. JONES then asked if the CHS spoke Turkish. The CHS translated the ISIS video for SCHIMENTI and JONES into English.

84. After watching ISIS videos, SCHIMENTI and JONES agreed to drive to a restaurant. While at the restaurant, JONES continued to ask the CHS questions, including if the CHS was from the east or west part of the particular city in the Middle East, and how much money the CHS paid for rent. SCHIMENTI told the CHS that he makes "dua [prayer]" for the CHS's family and the CHS's brother because the CHS's brother (whom SCHIMENTI had been told was an ISIS fighter) is "of the best." SCHIMENTI added that he asked Allah to "get behind the mujahideen's [fighter's] arrows, whether its Kalashnikov [a type of assault rifle], you know, whatever it is, you know, the knife...Allah you strike the kuffar..."

85. After leaving the restaurant, SCHIMENTI and the CHS followed JONES to the **Subject Premises**. JONES parked his vehicle at his house and JONES and his daughter entered SCHIMENTI's vehicle to travel to a location in Waukegan, Illinois.

86. While driving, JONES told SCHIMENTI that when SCHIMENTI leaves,[14] he should not take his phone to the airport. JONES told the CHS that SCHIMENTI had a lot of Dawla [Islamic State] videos on his phone and they may check his phone because of his beard and the mark on his head. JONES told the CHS that "the Feds" came to his house so he may already be on a list.

87. Later, SCHIMENTI, JONES, and the CHS drove in SCHIMENTI's vehicle back to Zion. During the drive, JONES told the CHS, "We only listen to what

---

[14] SCHIMENTI had previously stated that he intended to travel to Pakistan to meet a woman whom he intended to marry in the United States.

41

the Dawla [ISIS] put out." JONES further stated he was watching the CHS's face light up when they were all watching the ISIS video in SCHIMENTI's house. JONES stated that it made him, "So happy." JONES stated that when he introduced UC2 to UC4, UC2 stated that UC4 needed to study and understand Islam. JONES also recalled when UC2 told him about how UC1 was in an ISIS school and had to learn the deen [faith] before UC1 could go fight. In addition, JONES mentioned an Al-Nusra [the designated foreign terrorist organization Jabat Al-Nusra] brother who gave bay'ah to ISIS, and the Al-Nusra brother stated ISIS would not let you fight for them until you know your deen. Towards the end of this meeting, JONES asked the CHS when the CHS was going to be off work so they could all get together again.

88.     On or about March 4, 2017, the CHS met with SCHIMENTI at a gym in Zion, Illinois, and the meeting was audio recorded. During the physical fitness training, the CHS told SCHIMENTI that the CHS did not want to train to have a lot of muscles. SCHIMENTI told the CHS that weights support the cardio, and that cardio supports the weights. SCHIMENTI continued, "All of this, make you, make you good, you know in, in the battlefield." SCHIMENTI added, "No. I'm serious." After the CHS told SCHIMENTI that ISIS will train him once he goes over to join them, SCHIMENTI responded, "they gonna train you," and added that it would be good for the CHS to be "ready for this" as well.

89.     After leaving the gym, SCHIMENTI and the CHS drove to a parking lot near a cellular telephone store. SCHIMENTI told the CHS that the phone store is

42

"right here" and stated they could go to the phone store first if the CHS wanted to. The CHS asked SCHIMENTI if he wanted to eat first, and SCHIMENTI responded, "Yeah, we can go and eat first." The CHS asked if the phone store SCHIMENTI pointed out was the one with the "Muslim guy" whom SCHIMENTI previously mentioned. SCHIMENTI responded in the affirmative. While eating lunch, the CHS told SCHIMENTI he loved the lifestyle SCHIMENTI lived. The CHS mentioned that SCHIMENTI wakes up, works out, and eats. SCHIMENTI responded, "I hope that I am not too comfortable." SCHIMENTI added that the life the CHS's brother (the purported ISIS fighter) is living is, "Much better." After telling SCHIMENTI that the CHS planned to travel from Chicago to Germany to Turkey [to join ISIS], SCHIMENTI asked, "Not Jordan?" SCHIMENTI further stated that Turkey was "Against the Dawla [ISIS]." SCHIMENTI claimed another person asked him why he does not travel to join ISIS. SCHIMENTI stated he does not know if his faith was, "ready for a Federal case." After the CHS told SCHIMENTI he was getting ready to get some phones, SCHIMENTI responded, "I'm just proud of you brother." The CHS told SCHIMENTI that the CHS thought the ISIS fighters overseas, including his purported brother, would use some of the cell phones for "bombs" and attach them to "C4" (a type of explosive). SCHIMENTI agreed.

90.     While at the cellular telephone store, in Zion, Illinois, the CHS purchased 11 cellular phones, some broken and some operable. After the CHS told SCHIMENTI not to provide any financial assistance, SCHIMENTI purchased a

43

phone charger for the CHS. SCHIMENTI justified the purchase by saying, "I know what these are going for." While driving back to the CHS's car at the gym, SCHIMENTI stated "always I am thinking one day insha'allah [God willing]" of the Naval graduation that takes place on "Buckley." Based on my training and experience, I know that Naval Station Great Lakes, which trains Navy recruits, is located on Buckley Street in North Chicago, Illinois.

91.     SCHIMENTI further stated the Navy has graduations there every Friday and there are "Many people...always thinking akhi, so pray I get the faith." Based on my training and experience, I believe that SCHIMENTI was referring to gathering the courage to launch some sort of attack at Naval Station Great Lakes.

92.     On or about March 11, 2017, the CHS met with SCHIMENTI and JONES at the CHS's apartment in Chicago, Illinois. At one point during the meeting, which was audio recorded, SCHIMENTI, JONES, and the CHS drove to a restaurant. On the way to the restaurant, JONES asked the CHS, "When you trying to get out of here?" The CHS responded, "Soon." SCHIMENTI told the CHS that he "called the guy," which in context I believe to be a reference to person who worked at the cellular telephone store in Zion, Illinois. SCHIMENTI further stated, "Inshallah [God-willing], I'll just go up there and I'll just get them to you." SCHIMENTI further cautioned the CHS to look through them [cell phones] and make sure the phones are not cracked.

44

93. At the restaurant, SCHIMENTI told JONES that the CHS's brother had not texted the CHS in a while because the CHS's brother was busy defending the Ummah [the Muslim community]. JONES responded, "Alhumdulliah [praise be to God]." JONES then explained, in detail to the CHS, about how the ISIS facilitation network purportedly operated by UC2 worked. The CHS asked JONES if he [JONES] could talk to [UC2] about him [the CHS]. JONES responded, "I'll ask [UC2]." JONES further stated UC2 will "come here [Zion]" to meet with the CHS.

94. Later, at the CHS's apartment, JONES talked about people going through a six week class for those who want to go overseas and join ISIS. The CHS also explained to JONES and SCHIMENTI that the fighters needed phones. Furthermore, JONES told SCHIMENTI and the CHS not to take their phones to the airport because the government may seize their phones. Later that evening, after watching ISIS videos at the CHS's apartment, JONES and SCHIMENTI decided to leave. Before leaving, JONES told the CHS he would let the CHS know when UC2 contacted him (JONES). SCHIMENTI, again, stated he would "talk to the dude at [telephone] store."

95. JONES, during the meeting on or about March 11, 2017, with SCHIMENTI and the CHS described above, used Communication Platform 1 to tell UC2, "Brother there is another brother who is ready." UC2 responded, "AllahuAkhbar [God is great]. May Allah (SWT) be pleased with your efforts and reward you with the highest level of Jannah [paradise]. How long have you known this brother and

45

hiw did you meet. InshaAllah when is he looking to make a move." JONES explained that the CHS was ready to go and was looking to get to ISIS-controlled territory with the help of UC2's facilitation network. Specifically, JONES stated, "[the CHS] is ready to move quick ahki. This brother is from [specific city and country redacted] and [the CHS] is planning to go already. I have known [the CHS] a few months. I met him through our brother who you met [SCHIMENTI] with me and [UC1]. They [SCHIMENTI and the CHS] work together. [The CHS] is on the haqq and is in contact with [the CHS's] family. [The CHS] is planning to try to go 1 way with a lot of obstacles and is wondering if you were in tune with one's in the place you visited when our 1st bro left that can assist in his journey on a smoother journey with less obstacles. [The CHS] knows the terrain and has already supplied himself with equipment suggested by his blood brother there." UC2 stated, "InshaAllah i'll reach out to the [Individual A] and give [Individual A] the good news. I know everythung is still good to go. No matter how Shaytan [Devil] tries he can never disrupt anything that Allah (SWT) has blessed."

96. On or about March 13, 2017, using Communication Platform 2, SCHIMENTI provided a phone number used by JONES to the CHS. Around the same time but after getting the phone number from SCHIMENTI, the CHS initiated contacted with JONES on Communication Platform 2. JONES responded back with his username on Communication Platform 1, and requested the CHS to add JONES as a contact on Communication Platform 1.

97.     On or about March 14, 2017, using Communication Platform 1, JONES initiated a conversation with the CHS. During this conversation, JONES stated that UC2 had spoken with Individual A, and they are pleased to know there are brothers on the Haqq [truth]. JONES admonished the CHS not to use names on Communication Platform 1. JONES informed the CHS that JONES would provide the CHS's username on Communication Platform 1 to UC2, and that UC2 would use Communication Platform 1 to establish contact with the CHS. Later on the same day, JONES asked the CHS if UC2 had made contact with him yet. The CHS responded that UC2 had not made contact so far. JONES replied, "Ok don't worry [UC2] will."

98.     Also on or about March 14, 2017, using Communication Platform 1, JONES initiated a conversation with UC2. JONES stated, "Assalamalaikum [peace be upon you]. [The CHS] is ready ahki [brother]." JONES then provided the CHS's username on Communication Platform 1 to UC2. JONES stated, "[The CHS] is expecting you to contact." UC2 responded, "InshaAllah I will hit [the CHS] soon."

99.     That same day, the CHS met with SCHIMENTI in Highland Park, Illinois. During the meeting, which was audio recorded, SCHIMENTI stated that he was very suspicious of UC2, and had a "real funny feeling" about UC2. SCHIMENTI added that he did not trust UC2. SCHIMENTI further stated that he wanted to talk to the CHS before the CHS met with UC2. SCHIMENTI stated that he did not bring it up in conversation in front of JONES during dinner with the CHS and JONES on

47

March 11, 2017, because SCHIMENTI did not want JONES to think he was "trying to prevent you [the CHS] from going to do what you're going to do."

100. During the meeting, SCHIMENTI stated, "I know I'm still being observed." SCHIMENTI also stated he knows the FBI does not just give back property and walk away. SCHIMENTI stated, "There's something in law called entrapment" and they [FBI] know ways to do this within the law. SCHIMENTI further stated, "It's a federal offense to say, make it be known, and tell anybody I've given bay'ah [pledged allegiance] to Abu Bakr Al-Baghdadi [the leader of ISIS]." SCHIMENTI explained the reason it was a federal offense was because Al-Baghdadi gave a fatwa advocating violence against kuffar [non-believers] in the lands they [non-believers] reside in. SCHIMENTI further stated UC2 was trying to "entrap" him by asking SCHIMENTI if he wanted to "rock it out [conduct an attack against the homeland]." In addition, SCHIMENTI stated Yusuf [JONES] would be upset with SCHIMENTI for talking bad about UC2. SCHIMENTI stated, "I did send you the number [JONES' phone number]," and further stated he was not going to block the CHS from the opportunity to travel. Regarding the CHS traveling to join ISIS through [UC2], SCHIMENTI stated, "It could be true." SCHIMENTI continued, "Everything could be fine." SCHIMENTI added that he could be "overthinking" everything.

101. On or about March 15, 2017, using Communication Platform 1, the CHS informed JONES that UC2 had made contact with the CHS via Communication

Platform 1. JONES responded, "May Allah reward you good for your intentions and purify them for his sake."

102.   On or about March 17, 2017, using Communication Platform 1, UC2 notified JONES, "I reached out to our brother." JONES responded, "Alhumdulillah rabbil alamin. Jazakallah khair. Where you able to assist [the CHS]?" UC2 responded, "InshaAllah already in motion. AllahuAkhbar." JONES stated, "May Allah reward you good."

103.   On or about March 17, 2017, the CHS met with SCHIMENTI at a restaurant in Zion, Illinois, and then, after they ate, they went to a cellular telephone store. During this meeting, which was audio recorded, the CHS told SCHIMENTI that the CHS was in communication with UC2 via Communication Platform 1, and that the CHS may ask questions of UC2 if they meet in person. SCHIMENTI asked the CHS if the CHS asked UC2 questions on Communication Platform 1. The CHS told SCHIMENTI that the CHS would ask UC2 questions once they meet in person.

104.   During this meeting, SCHIMENTI and the CHS went to the cellular telephone store. While at the store, SCHIMENTI negotiated with the sales person for a cheaper price on the phone the CHS was interested in. SCHIMENTI and the CHS made plans to meet again on March 18, 2017.

105.   On or about March 17, 2017, using Communication Platform 1, JONES initiated a conversation with the CHS. JONES inquired what time the CHS was expected to be in Zion, Illinois, on March 18, 2017. The CHS provided an estimated

time frame for the CHS's arrival. JONES responded, "Ok I have a few phones for you."

106. On or about March 18, 2017, the CHS met with SCHIMENTI and JONES in Zion, Illinois, which was audio recorded. Before entering the cellular telephone store, SCHIMENTI stated, "I called here earlier." SCHIMENTI further stated he thought the sales person in the store is "the Muslim." After the CHS asked SCHIMENTI if Yusuf [JONES] had phones, SCHIMENTI responded in the affirmative. SCHIMENTI further asked the CHS if he wanted him to make a phone call to Yusuf [for the phones]. SCHIMENTI called JONES and stated he was "up here at the ... [cellular telephone]... store." SCHIMENTI further told JONES that the CHS needed to ask JONES a question before the CHS buys the "used ones [phones]." While handing his phone to the CHS, SCHIMENTI stated that JONES told them to "come by [his house]." While on the phone with JONES, the CHS asked JONES if he had working or non-working phones. Shortly afterwards, the CHS ended the conversation with JONES. After the CHS purchased phones from the store, SCHIMENTI asked the CHS if the CHS wanted to head over to Yusuf's [JONES' residence]. SCHIMENTI added, "He [JONES] has some also." SCHIMENTI then asked, "You wanna uh follow me over there?"

107. SCHIMENTI and the CHS then traveled to JONES's residence (the **Subject Premises**). While at JONES's residence, JONES told the CHS there was a new video by Abu Bakr Al-Baghdadi [the leader of ISIS] that he received from

50

Communication Platform 4. JONES asked the CHS to translate the video for him due to the lack of subtitles.

108. During this meeting, JONES provided the CHS with two cell phones. After receiving the phones, the CHS asked JONES if he was sure he wanted to provide the phones. JONES responded in the affirmative. JONES stated the phones were just "laying around the house anyway akhi [brother]." JONES added, "Maybe I can get more." The CHS told JONES and SCHIMENTI that the CHS was going to send phones to the CHS's aunt.[15] JONES said if he gets more [phones], he would give them to the CHS. After the CHS told JONES that the CHS would pay money for the phones that JONES provided, JONES stated he did not want any money but claimed he needed "something for the hereafter."

109. During the meeting, the CHS told JONES and SCHIMENTI that the CHS watched on YouTube what the brothers [ISIS fighters] do with the phones. As the CHS paused to remember a specific word in English, SCHIMENTI interrupted and asked, "Detonator?" the CHS confirmed the word "detonator" was the word that the CHS was attempting to remember. JONES further stated if the CHS provides the CHS aunt's address, JONES would continue to provide phones to the CHS after CHS leaves the United States and joins ISIS. The CHS told JONES that the CHS had sent packages to his aunt, and his aunt can send those packages to Istanbul, Turkey. The CHS told JONES that rom Istanbul, there is a brother who can take it [to Syria]. As

---

[15] As set forth in the paragraph below, the CHS later explained that his aunt was purportedly a member of a network that could send items to ISIS-controlled territory in Syria.

the CHS prepared to leave JONES' residence, JONES thanked the CHS for translating the Abu Bakr Al-Baghdadi video for him.

110. On or about March 21, 2017, UC2 informed JONES that UC2 intended to meet the CHS the weekend of March 24 and asked if JONES was going to be available for this meeting. JONES stated he was available that Sunday or Saturday evening. JONES asked which day was best for UC2. UC2 confirmed Sunday would be the day JONES will introduce the CHS to UC2. UC2 asked if the meeting should occur in the same location (referring to the meeting on or about December 13, 2016). JONES responded, "Sure akhi that will be OK. Maybe we can grab some food this time in Shaa Allah." On or about March 25, 2017, UC2 provided the approximate time of the meeting on March 26, 2017. JONES responded, "Ok [UC2], I'll be on point. I will have [the CHS] come up here here. In Shaa Allah."

111. On or about March 26, 2017, the CHS met with JONES in Zion, Illinois, with the intention of going to meet UC2 in Gurnee, Illinois. This meeting was audio recorded. The CHS picked up JONES from the **Subject Premises** and JONES directed the CHS to the area where he arranged to meet with UC2. After the CHS picked up JONES from the **Subject Premises**, JONES stated that he told SCHIMENTI to come to the meeting with UC2. JONES further stated they [JONES and the CHS] would possibly meet with SCHIMENTI after they meet with UC2.

112. During the drive, JONES explained to the CHS how he first met UC2 through UC1. According to JONES, after the "Feds" raided SCHIMENTI's house,

52

SCHIMENTI became nervous at a hotel meeting with [UC1] and [UC2] and began to think they were Feds. JONES stated if they [UC1 and UC2] were Feds, they could have taken them [JONES and SCHIMENTI] to jail already. JONES also stated that he knew "another brother named [UC4]." JONES continued, "I helped [UC4] leave [to join ISIS] too." JONES told the CHS that UC2 never asked JONES to find more people or showed JONES anything to be nervous about.

113. Also while waiting in the CHS's vehicle for UC2 to arrive at the meeting location, JONES asked the CHS if the CHS had talked with the CHS's brother [the purported ISIS fighter] lately. The CHS responded that the CHS's brother sent the CHS a video that the CHS could access via Communication Platform 5. The CHS then showed a video of a Humvee being hit by an IED. The CHS explained that ISIS fighters are attaching phones to explosives to blow up vehicles.

114. JONES then asked the CHS to provide JONES with the CHS's aunt's address. The CHS responded that the CHS would. JONES also asked the CHS for the CHS's social media account, so they [the CHS and JONES] can communicate when the CHS arrives in Syria. JONES further asked if the CHS's brother knew that the CHS was coming to join him.

115. UC2 then entered the CHS's vehicle. After initial greetings and introductions, UC2 asked JONES if he took care of "everything [preparation for travel]." JONES responded, "Yeah. I let him know everything." UC2 asked background questions of the CHS, and then provided a list of items needed for travel.

JONES, UC2, and the CHS exited the vehicle and walked into a restaurant to eat lunch. After lunch, UC2 departed the area, and the CHS and JONES drove back to the **Subject Premises**.

116. After making a phone call to SCHIMENTI, JONES told the CHS that SCHIMENTI was at the same location in Gurnee, Illinois, where JONES and the CHS had just met UC2. JONES stated that SCHIMENTI was on his way to the **Subject Premises**. JONES and the CHS returned to the **Subject Premises**. Later that day, SCHIMENTI arrived at the **Subject Premises**.

117. After arriving at the **Subject Premises**, the CHS joked about putting the ISIS flag on top of the **Subject Premises**. SCHIMENTI stated he would like to see the flag "on top of the White House." The CHS told SCHIMENTI that the CHS met with UC2, and that the CHS thought UC2 was a good brother. The CHS further stated that the CHS was going to leave [to travel to Syria] before SCHIMENTI leaves [to travel to Pakistan].

118. During this meeting at the **Subject Premises**, JONES provided an additional cell phone to the CHS. JONES stated he hoped it kill many "kuffar [non-believers]." SCHIMENTI also said, "Many." The CHS stated that the CHS sent the other phones the CHS had acquired to the CHS's aunt, and the CHS hoped to send more to the CHS's aunt later. JONES told the CHS to provide the CHS's aunt's address before the CHS leaves so JONES could keep sending as many phones as he could. The CHS said when the CHS makes it to Syria, the CHS will make a video and

upload it for JONES and SCHIMENTI to view. SCHIMENTI stated if he sees the CHS "cutting the kuffar neck," SCHIMENTI will be "so happy that day."

119.   JONES recommended they all take a picture in front of the ISIS flag so that the CHS's brother could have it. All three took a picture in front of the flag. The CHS then departed the **Subject Premises**. The following is the picture with the CHS's face pixelated.



120.   The CHS has witnessed JONES use a black Samsung phone on multiple occasions (**Subject Phone 2**). During the meeting on or about March 26, 2017, as well as the meetings on or about March 11 and March 18, 2017, JONES showed the CHS ISIS videos on **Subject Phone 2**. These videos consisted of a speech by Al-

55

Baghdadi (the leader of ISIS), information on how to decapitate individuals, and Turkish soldiers being burned.

121.  On or about March 29, 2017, the CHS met with SCHIMENTI at the CHS's residence in Chicago, Illinois, which meeting was audio recorded. While driving to a restaurant, SCHIMENTI claimed he called three places looking for phones to give to the CHS. SCHIMENTI gave the CHS six phones in a bag. The CHS asked SCHIMENTI how much he paid [for the phones]. SCHIMENTI responded, "Five dollars." When the CHS told SCHIMENTI that the CHS would pay SCHIMENTI back, SCHIMENTI declined the offer and stated, "I know where they're going." The CHS stated that the CHS hoped each one would kill 20 people. SCHIMENTI responded, "Many kuffar."

122.  While at the CHS's residence, the CHS showed SCHIMENTI a video clip of a Humvee being blown up by an IED. The CHS explained that the phones JONES and SCHIMENTI provided were being used for this purpose. In the video clip, as the Humvee approaches the IED, SCHIMENTI stated, "Landmine." After the IED goes off in the video clip, SCHIMENTI stated, "Yes. Yes." SCHIMENTI further stated that people do not understand that "we" have people who have expertise in paving roads and operating guns. SCHIMENTI stated that Allah gives understanding to whom he pleases. SCHIMENTI stated, without this understanding, SCHIMENTI would not know the "Dawla [ISIS] sister" and SCHIMENTI would not know the brother "who had the bomb in his shoe [Richard Reid]." SCHIMENTI stated he [Richard Reid] was

56

a "good brother." SCHIMENTI pulled up a picture of Richard Reid for the CHS. SCHIMENTI also stated that Richard Reid was upon "Haqq [truth]" and SCHIMENTI could show the CHS letters from Reid.

123. While still at the CHS's residence, during prayers, SCHIMENTI prayed that Allah "continue to expand your State…protect all the mujahedeen…continue to humiliate the kuffars."

124. The CHS told SCHIMENTI that he needed to go shopping for a few items in preparation for his travel. SCHIMENTI offered to drive the CHS to the store. The CHS told SCHIMENTI that UC2 suggested the CHS could buy things from the list he received from UC2. SCHIMENTI asked the CHS when the CHS was going to go visit his aunt (i.e. the person who would facilitate the shipment of overseas items). SCHIMENTI added that he may go buy a compass and bring it to the CHS. While shopping, after the CHS expressed excitement for his trip and that he would send SCHIMENTI videos, SCHIMENTI stated, "I want to see blood flowing, whatever way." A short time later, SCHIMENTI said, "You can Google my name and I put it in English so the Kuffar can see, Islamic State here to stay!"

125. On or about April 7, 2017, SCHIMENTI and JONES ate dinner with the CHS. During the meal, JONES told the CHS that he felt ashamed that he was not traveling as well. SCHIMENTI told the CHS to "drench that land with they, they blood." Afterward, SCHIMENTI and JONES drove the CHS to O'Hare International

57

Airport in Chicago with the understanding that the CHS would be traveling from Chicago to Syria to join and fight with ISIS.

### SEARCH OF SUBJECT PHONES 1 AND 2

126. Based upon my training and experience, I know that cellular phones may contain relevant evidence of the conspiracy to provide material support or resources to a foreign terrorist organization, including text messages and other methods of communication, made or received from the **Subject Phones** that are located in the memory of the **Subject Phones**, which messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in the conspiracy to provide material support to a foreign terrorist organization. Moreover, digital photographs located in the memory of the **Subject Phones** may contain images of the tools or participants involved in the conspiracy to provide material support or resources to a foreign terrorist organization. Moreover, digital photographs stored in the **Subject Phones** may contain images of the user of the **Subject Phones**, the user's associates (including persons involved in or knowledgeable about the subject offenses), places frequented by the user of the phone leading up to and during the subject offenses, and locations and instrumentalities used in committing the subject offenses. Furthermore, videos located in the memory of the **Subject Phones** may contain evidence of conspirators' knowledge, willfulness and intent with regard to conspiracy to provide material support or resource to a foreign terrorist organization.

58

127. In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

128. Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone

may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

## SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

129. Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.     Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

60

b.  Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

130.  In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

131.  In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

61

## PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

132. Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachments A-1, A-2 and A-3, so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

133. The review of electronically stored information and electronic storage media removed from the premises described in Attachments A-1, A-2 and A-3 may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a. examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachments B-1, B-2 and B-3;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachments B-1, B-2 and B-3 (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal

activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

    c.    surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachments B-1, B-2 and B-3;

    d.    opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachments B-1, B-2 and B-3.

134.    The government will return any electronic storage media removed from the premises described in Attachments A-1, within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.[16]

135.    I respectfully submit that the facts set forth above establish probable cause to believe that JOSEPH D. JONES, a/k/a "Yusuf Abdulhaqq," and EDWARD SCHIMENTI, a/k/a "Abdul Wali," have violated Title 18, United States Code, Section 2339B(a)(1), as charged in the criminal complaint:

---

[16] As set forth in this affidavit, there is probable cause to believe that **Subject Phone 1** and **Subject Phone 2** are instrumentalities of the offense of conspiring, and attempting to provide, material support or resources to foreign terrorist organizations, in violation of Title 18, United States Code, Section 2339B(a)(1), the government anticipates that **Subject Phone 1** and **Subject Phone 2** will be seized rather than returned to the defendants.

136. Based on the above information, I respectfully submit that there is probable cause to believe that JOSEPH D. JONES and EDWARD SCHIMENTI have conspired and attempted to provide material support or resources to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B(a)(1), and that evidence relating to this criminal conduct, as further described in Attachments B-1, B-2 and B-3, will be found in the **Subject Premises** and **Subject Phones**, as further described in Attachments A-1, A-2 and A-3.

137. I therefore respectfully request that this Court issue a search warrant for the single family home located at 2120 Carmel Boulevard in Zion, Illinois, more particularly described in Attachment A-1, and the Subject Phones more particularly described in Attachments A-2 and A-3, authorizing the seizure of the items described in Attachments B-1, B-2 and B-3, respectively, pursuant to the protocol described in the addendum to Attachments B-1, B-2 and B-3.

FURTHER AFFIANT SAYETH NOT.

Cassandra B. Carnright
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
before me this 11th day of April, 2017

Honorable M. David Weisman
United States Magistrate Judge

65

AO 93 (Rev. 11/13) Search and Seizure Warrant

AUSA Barry Jonas, (312) 886-8027

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### UNDER SEAL

In the Matter of the Search of:

The Google account abdwali.es@gmail.com, further described in Attachment A

Case Number:   17 CR 236

### SEARCH AND SEIZURE WARRANT

To: Phillip Viggiani and any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Northern District of California:

### See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### See Attachment A

**YOU ARE HEREBY COMMANDED** to execute this warrant on or before July 6, 2017 in the daytime (6:00 a.m. to 10:00 p.m.).

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate Judge.

Date and time issued: June 22, 2017 @ 3:00 p.m

_____
Judge's signature

City and State: Chicago, Illinois

M. David Weisman, U.S. Magistrate Judge
_____
Printed name and title

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

## Return

| Case No: | Date and Time Warrant Executed: | Copy of Warrant and Inventory Left With: |
|---|---|---|
| | | |

Inventory made in the presence of:

Inventory of the property taken and name of any person(s) seized:

## Certification

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

**I.    SEARCH PROCEDURE**

1.    The search warrant will be presented to Google personnel, who will be directed to isolate those accounts and files described in Section II below.

2.    In order to minimize any disruption of computer service to innocent third parties, company employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein.

3.    Google employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant.

4.    Following the protocol set out in the Addendum to this Attachment, law enforcement personnel will thereafter review information and records received from company employees to locate the information to be seized by law enforcement personnel specified in Section III below.

**II.    FILES AND ACCOUNTS TO BE COPIED BY EMPLOYEES OF GOOGLE**

To the extent that the information described below in Section III is within the possession, custody, or control of Google, which are stored at premises owned, maintained, controlled, or operated by Google, headquartered at 1600 Amphitheatre

Parkway, Mountain View, California, 94043, Google is required to disclose the following information to the government for the following account:

**Abdwali.ES@gmail.com**

a.     All available account contents from inception of account to present, including e-mails, attachments thereto, drafts, contact lists, address books, and search history, stored and presently contained in, or maintained pursuant to law enforcement request to preserve.

b.     All electronic files stored online via Google Drive, stored and presently contained in, or on behalf of the accounts described above.

c.     All search history records stored and presently contained in, or on behalf of the accounts described above including, if applicable, web and application activity history (including search terms), device information history, and location history.

d.     All existing printouts from original storage of all the electronic mail described above.

e.     All transactional information of all activity of the electronic mail addresses and/or individual accounts described above, including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations.

f.     All business records and subscriber information, in any form kept, pertaining to the electronic mail addresses and/or individual accounts described above, including applications, subscribers' full names, all screen names associated

2

with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing and payment records.

g.    All records indicating the services available to subscribers of the electronic mail addresses and/or individual accounts described above.

h.    All account contents previously preserved by Google, in electronic or printed form, including all e-mail, including attachments thereto, and Google Drive stored electronic files for the accounts described above).

i.    All subscriber records for any Google account associated by cookies, recovery email address, or telephone number to the accounts described above.

## III.    Information to be Seized by Law Enforcement Personnel

All information described above in Section II that constitutes evidence concerning violations of Title 18, United States Code, Section 2339B(a)(1), as follows:

1.    Items related to the Islamic State of Iraq and the Levant ("ISIL"), the Islamic State of Iraq and Syria ("ISIS"), Abu Bakr al-Baghdadi, jihad, terrorism, martyrdom, bayah, weapons or physical training, and any individuals or organizations associated with the above.

2.    Items related to the commission of acts of violence in the United States or overseas, including justifications for such conduct, the selection of a target or targets, the logistics of such conduct, and any tools or weapons to be used in such conduct.

3

3. Items related to the purchase of cellular phones.

4. Communications with UC1, UC2, UC3, UC4, CHS, EDWARD SCHIMENTI, and JOSEPH JONES, or any other individual who appears to be associated with ISIS.

5. Items concerning the ownership, use or control of the **Subject Account.**

6. All of the records and information described in Section II (e), (f), (g), and (i).

## ADDENDUM TO ATTACHMENT A

With respect to the search of any information and records received from the free web-based electronic mail service provider, law enforcement personnel will locate the information to be seized pursuant to Section III of Attachment A according to the following protocol.

The search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

     a.    searching for and attempting to recover any hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

     b.    surveying various file directories and the electronic mail, including attachments thereto to determine whether they include data falling within the list of items to be seized as set forth herein;

     c.    opening or reading portions of electronic mail, and attachments thereto, in order to determine whether their contents fall within the items to be seized as set forth herein; and/or

     d.    performing key word searches through all electronic mail and attachments thereto, to determine whether occurrences of language contained in such

5

electronic mail, and attachments thereto, exist that are likely to appear in the information to be seized described in Section III of Attachment A.

Law enforcement personnel are not authorized to conduct additional searches on any information beyond the scope of the items to be seized by this warrant.